PELHAM G. WODEHOUSE, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 3401, 6487. Promulgated March 28, 1947.

*Watson Washburn, Esq.*, for the petitioner.
*Walt Mandry, Esq.*, for the respondent.

VAN FOSSAN, *Judge*: The respondent determined deficiencies in the petitioner's income tax liabilities and imposed penalties as follows:

| Docket No. | Year | Deficiency | Penalty |
|---|---|---|---|
| 6437 | 1923 | $2,699.83 | $881.03 |
|  | 1924 | 5,567.25 | 1,555.07 |
|  | 1938 | 12,220.86 | |
|  | 1940 | 8,080.83 | |
|  | 1941 | 2,802.08 | |
| 3401 | 1937 | 21,328.82 | 10,664.41 |

The petitioner claimed overpayments of $1,121.89, $3,156.32, and $14,290.12 for the years 1938, 1940, and 1941, respectively.

The cases before us present a number of issues, some common to two or more of the taxable years and some peculiar to a single year. They are best stated by relating them to the several taxable years. The facts pertinent to such issues and the opinions thereon will be set forth in the same manner.

The petitioner is a British subject, formerly residing at Le Touquet, France. From June 1940 until the date of the petition, November 13, 1944, he was in the custody of the German Government in territory controlled by the German Army. During the years prior to June 1940, he was a resident of either England or France. During the taxable years he was a nonresident alien, with the exception of the period hereinafter mentioned. The petitioner was unable to attend the trial of the proceeding because of the Government's restrictions on travel from France.

The petitioner was a prolific writer of serials, plays, short stories, and other literary works. He is a well known writer of stories and has a wide reputation as such in the United States. His writings were in demand by the public and were accepted and published by the Saturday Evening Post, Red Book, Liberty, Collier's, Cosmopolitan, and other such magazines. During the taxable years and for several years prior thereto the sale of the petitioner's writings in the United States was accomplished by one or more literary agents.

### The Years 1923 and 1924.

*Issues:*

(1) The major issue both in time and importance is the applicability of the statute of limitations, based on the alleged failure of the petitioner to file income tax returns for those years.

(2) The subordinate issues are:

(a) The taxability of payments for the petitioner's literary works;

(b) The deductibility of his literary agents' commissions;

(c) The right of the petitioner to personal exemption;

(d) The imposition of the 25 per cent penalty for failure to file income tax returns.

R. J. Denby took care of the petitioner's business in the United States from 1918 to 1926. Paul R. Reynolds is a literary agent. He or his firm has acted for the petitioner in that capacity since 1918. The American Play Co. (owned by John W. Rumsey) is a literary and dramatic agent and has acted as such for the petitioner since 1914. Over a period of five or six years, beginning about 1920, Rumsey filed various tax returns for the American Play Co., showing withholding taxes for the petitioner's account.

During the period from 1918 to 1926, Denby took care of filing the petitioner's income tax returns and saw that the taxes were paid. While Denby was handling the petitioner's affairs a controversy with the Treasury Department arose, involving the petitioner's status as a nonresident alien. About 1923 the further question was raised as to whether or not outright sales and royalties produced exempt income. In 1923 the Department sent a letter to the petitioner's representative (addressed to the petitioner) stating that it contained a settlement to date. The letter, and also copies relating to income tax return files, were left with Rumsey, who cooperated with Denby in handling the petitioner's income tax returns in the early twenties.

In May 1938 Rumsey's business collapsed and he moved his office files to a room containing less than one-tenth of the space which he formerly occupied. He took from the old office only papers relating to the period from 1931 to 1938. All other papers were thrown away except two ledger sheets, which he was able to find and which show the following payments made to the collector of internal revenue for the petitioner:

| | |
|---|---|
| June 16, 1919 | $1,000.00 |
| Mar. 24, 1923 | 430.00 |
| Mar. 31, 1923 | 1,781.22 |
| Apr. 12, 1923 | 4,739.72 |
| Aug. 23, 1923 | 1,267.24 |

Rumsey continued to have numerous financial transactions with the petitioner during 1923, 1924, and 1925. Shortly after August 23, 1923, Rumsey established a "mechanical system" of bookkeeping, which failed to work satisfactorily.

In the spring of 1933 the petitioner retained Watson Washburn, the attorney representing him in the cases before this Court, to endeavor to settle a controversy with the Government relating to the petitioner's income tax liability for several years prior to 1931.

Washburn cooperated with the agents of the respondent to determine the facts on which such liability would be based. It appeared

that the petitioner had not filed returns for certain years prior to 1932, but that withholding returns had been filed for him.

Washburn's discussions with the respondent's agents covered the period from 1925 to 1933, inclusive, and also involved years prior to 1925. The agents concluded that the petitioner owed between $200,000 and $300,000 in income taxes for the period from 1925 to 1933, inclusive. Washburn vigorously contested the finding and, after much discussion and negotiation, the petitioner's income tax liability and that of Jeeves Dramatics, Inc., his wholly owned corporation, for such period were compromised in June 1936 by the payment of approximately $85,000.

The petitioner, through his counsel, in his preparation for trial in these cases, applied for subpoenas directed to the collectors of internal revenue for the second and third districts of New York and requiring them to produce the tax returns of the petitioner, of the American Play Co. and of John W. Rumsey for the years 1918 to 1924, inclusive, and also any and all books, records, lists, files and memoranda relating to the filing of such returns, the contents thereof, and the payment of taxes by any of such persons in the years 1918 to 1925, inclusive. The subpoenas were properly served two days before the hearing.

The petitioner proposed to prove by such witnesses that the records of the collectors' offices would establish that the petitioner, or some one for him, filed timely returns for the years 1923 and 1924 in compliance with the law and that such records would disclose the petitioner's course of conduct and would demonstrate errors in the collectors' records for that period.

Deputy collectors from the two districts refused to testify "without the express permission of the Commissioner of Internal Revenue * * * on penalty of dismissal." The deputy collector from the second district made no attempt to obtain such permission and the representative from the third district stated that he had not had a chance to do so. The Court directed the deputy collector from the second district to answer a question asking him to produce the records and data set forth in the subpoena. The witness declined to answer "in view of his instructions." The representative for the third district adopted the same position.

The respondent's counsel offered in evidence so-called "certificates," not under seal, of various collectors of internal revenue purporting to show that their offices contained no record of the filing of returns for the years 1923 and 1924 by the petitioner. Ruling was reserved. Objection to the proffered certificates is sustained.

During the years 1923 and 1924 the petitioner received the following payments, as compensation from American publishing companies for serial rights in his literary works and for short stories:

|  | 1923 | 1924 |
|---|---|---|
| Royalty income | $33,907.82 | $48,609.97 |
| Less commissions | 3,390.78 | 4,861.00 |
| Net | 30,517.04 | 43,748.97 |

About 90 per cent of such payments were made in lump sums and were received from sales to magazines.

The statement attached to the respondent's notice of deficiency contains the following items in the "Explanation of Adjustments" for the year 1923:

Net credits for 1923 (P. R. Reynolds & Son Agency) _____ $22,029.19
Net credits for 1923 (American Play Co. Agency) _____ 8,487.85

and in the computation of tax for that year appears the following notation:

Tax withheld at source:
Through P. R. Reynolds & Son _____ $69.79
Through American Play Co _____ 754.48
                                                      ————— $824.27
Tax previously assessed _____ 0
                                                               ————
                                                              824.27

In the "Explanation of Adjustments" for the year 1924 are the following items:

Net credits for 1924 (P. R. Reynolds & Son Agency) ___ $35,261.12
Net credits for 1924 (American Play Co. Agency) _____ 8,487.85

and in the computation of tax for that year is the following notation:

Tax withheld at source:
Through American Play Co _____ $87.18
Through P. R. Reynolds & Son _____ 565.86
                                                      ————— $653.04
Tax previously assessed _____ 0
                                                               ————
                                                              653.04

The petitioner, or someone for him, duly filed timely income tax returns for the years 1923 and 1924.

### OPINION.

The basic issue here presented is whether or not the petitioner, or someone for him, filed income tax returns for the years 1923 and 1924. If he did not do so, obviously the statute of limitations does not apply and the tax may be assessed at any time. (Sec. 276 (a), Internal Revenue Code.) Otherwise, the assessment of the tax is barred by the statute. (Sec. 250, Revenue Act of 1921; sec. 277 (a) (1), Revenue Act of 1924; sec. 275 (a), Internal Revenue Code.)

At the outset, it is apparent that the petitioner is confronted with a difficult task of proving that he or his agent actually filed his income tax returns for the years in question.

The petitioner was not present at the hearing. His absence was properly explained by the fact that Government restrictions on travel from France prevented his coming to the United States. The testimony of his "literary agents," or personal representatives in this country, was to the effect that they took care of the filing of his income tax returns during a period including the taxable years and that they saw that the taxes were paid.

The respondent's notice of deficiency for both years credits certain amounts to the petitioner obviously paid for him by the Reynolds and American Play Co. agencies. It also notes amounts of taxes "withheld at source" by those agencies. The implication is strong that the respondent's office contains data that were based on the petitioner's returns and served as the source of the respondent's computations. Although under subpoena to produce such data, as well as other records pertinent to the filing of the petitioner's returns for the taxable years, and in spite of the fact that they were directed by the Court to respond to such subpoenas and to questions pertinent thereto, the respondent's agents, representing the collectors of internal revenue for the second and third districts of New York, refused to testify and to produce the subpoenaed documents.

The respondent is subject to the general rule stated in *Capento Securities Corporation*, 47 B. T. A. 691, as follows:

When a party fails to produce documentary evidence pursuant to a notice to produce and no satisfactory explanation for such failure is given, an inference may properly be recognized that the evidence would be unfavorable to the party failing to produce it. Jones on Evidence, 3d Ed. §§ 19, 20, and cases cited. * * *

In that case the respondent asserted penalties on account of the petitioner's alleged failure to file returns within the time prescribed by law. We need not discuss the reason for the refusal of the respondent's agents to testify as directed. We need only to cite *Blair* v. *Oesterlein Machine Co.*, 275 U. S. 220, and *Brewer* v. *Hassett*, 2 Fed. Rules Dec. 222, to demonstrate that the respondent's position is utterly unwarranted and wholly indefensible. In the cases at bar, over 20 years after the returns for the taxable years were due, the respondent charges the petitioner with failure to file them. As was said in *Capento Securities Corporation, supra:*

* * * We can think of no situation which more clearly demands the application of this rule than that presented in the instant case, where the respondent has raised an issue involving the imposition of a penalty at a time in the proceeding when he has had in his possession the only evidence which can give a definite answer to the issue which he has raised, which by his own regulation he

should have preserved in the event of any such question, and which he failed to produce pursuant to proper notice.

So here, the respondent may have in his possession the documentary evidence which might have proved conclusively—and without the aid of the additional evidence of record—that the petitioner, or someone for him, did file the returns in question. Therefore, the only conclusion justified by this state of facts is that the respondent's files and records would have proved the petitioner's contention.

The further facts that, although the respondent and his agents made a long, thorough, and exhaustive examination and study of the petitioner's income tax liability—and the data supporting it—for the period from 1925 to 1933, inclusive, and while doing so discussed the years prior to 1925, yet the respondent failed to include the years 1923 and 1924 in the settlement covering the latter period and made no suggestion that the petitioner failed to file returns therefor, are definitely persuasive that such returns actually were filed.

In view of the affirmative facts of record and the respondent's refusal to cooperate by submitting and identifying exhibits and other data from his files showing, or tending to show, that the petitioner filed, or did not file, income tax returns for the taxable years, there is no substantial doubt in our minds that the petitioner, or someone for him, did file such returns. We so found as a fact and we now so hold.

The so-called "certificates" offered by the respondent were not in proper form for admission as evidence, as required by the Federal Rules of Court Procedure, and objection to their admission is sustained.

The statute of limitations has long since tolled against the assessment and collection of the taxes in question. Therefore, the subordinate issues need not be discussed.

### The Year 1937.

Issues:

(1) The applicability of the statute of limitations;
(2) The invalidity of a jeopardy assessment;
(3) The taxability of amounts received in payment for the petitioner's literary works by him or by Siva, a Swiss corporation;
(4) The imposition of a fraud penalty;
(5) The omission by the petitioner of 25 per cent of his gross income as stated on his return (raised by the respondent in his answer).

#### FINDINGS OF FACT.

Under date of April 26, 1934, the petitioner sold to Siva Aktiengesellschaft, Glarus, Switzerland (hereinafter called Siva), all his earnings, copyrights, royalties, commissions and other revenue from

the sale of his literary, theatrical, or cinematograph productions in North America, South America, and Canada, for a term of four years, for a consideration of $400,000. Attached to the agreement was a supplement, listing by title, copyrights and royalties on twenty-eight literary productions of the petitioner. Siva purchased all of the petitioner's literary output for four years, plus all of his previous writings. Siva's capital stock was the franc equivalent of $6,000. Its officers bore Swiss names and its place of business was in Zurich, Switzerland.

In May 1934 Rumsey was notified by the petitioner that he had sold all of his works to Siva and that he had recommended that Siva employ Rumsey as an agent to handle his past and future productions. Rumsey then received a letter from Siva asking him to act for it in that capacity. In June 1934 M. Weinbren, an English accountant representing Siva, called on Rumsey and asked him to keep him posted on transactions with Siva. Thereafter Rumsey dealt with either Weinbren or Siva in all matters relating to the sale of the petitioner's literary works. Later Rumsey became assistant treasurer of Siva.

Publishing houses which had published the petitioner's books received notice from the petitioner informing them of the sale to Siva. The Reynolds agency was instructed to pay to Siva the proceeds from the sale of the petitioner's stories and that firm made payments to Siva for the petitioner's literary works accepted in 1937.

Such payments made in 1937 were stipulated to aggregate $44,650, after deducting a 5 per cent commission, as lump sum payments for the purchase of all American and Canadian serial rights to certain stories written by the petitioner. Payments from other sources totaled $12,039.41. In his notice of deficiency the respondent added these sums to the petitioner's taxable income and also added thereto $4,999.50 denominated "miscellaneous adjustments." The amounts of these three items are not in dispute. Siva reported $56,689.41 (the sum of the first two items) in its income tax return for 1937.

The petitioner filed a timely nonresident alien income tax return for 1937, prepared by his attorneys. He reported the receipt of $28,712.52 as compensation for personal services and a net income of $23,655.61. The Commissioner determined a deficiency in tax of $21,328.82, based primarily on the inclusion of the said amount of $56,689.41 in the petitioner's income. He also asserted a fraud penalty of $10,664.41.

Siva was dissolved during the latter part of 1937 and all of the petitioner's copyrights were transferred back to him. The relationship between the petitioner and Siva was under investigation by the respondent as early as June 9, 1935, and became a factor in the compromise settlement of the petitioner's tax liabilities for the years 1925 to 1933, inclusive. In June 1936 the petitioner's offer in compromise

was accepted. It specifically referred to Siva. Some time thereafter Siva requested Washburn's firm to represent it in its income tax matters. Washburn discovered that the American Play Co. (Rumsey) had withheld tax for Siva, but had failed to pay such tax to the Government. Rumsey was sued and part of the amount due was collected.

Siva filed refund claims for income taxes withheld at the source on lump sum payments for 1934 and 1935. It also filed timely income tax returns for 1936 and 1937, claiming refunds of taxes withheld at the source. The 1937 claim for refund was based on the theory that Siva was not taxable on lump sum payments for literary rights because the transaction involved a sale of property by a foreign corporation not engaged in business in the United States.

The petitioner was engaged in business in Hollywood, California, from the fall of 1936 to the fall of 1937. His wife accompanied him. He filed timely returns for both years and amended his return for 1936, changing it from a community property to a separate individual basis. The petitioner was uncertain whether he or Siva would be entitled to the proceeds from his Hollywood salary contract, but he was advised by counsel that his salary for personal services was taxable to him, regardless of his contract with Siva.

On November 12, 1940, Washburn, on behalf of Siva, signed an agreement with the respondent fixing its additional tax liability for the years 1934 and 1935 at $1,266.54 and $377.03, respectively. The agreement was final—in the absence of fraud, etc.

Siva and the petitioner, through their attorney, Washburn, signed and delivered to the respondent's agent an agreement fixing their respective tax liabilities for the years 1936 and 1937 as follows:

Refunds of $1,269.70 and $723.89 to the petitioner for the years 1936 and 1937, respectively, and a refund of $352.50 to Siva for the year 1937. Siva's 1936 tax was unchanged. The petitioner's claim was about twice as large as the amount refunded for 1937 and Siva's claim for refund for the same year was $8,173.56. The respondent issued certificates of overassessment pursuant thereto on December 6, 1940, and March 18, 1941.

An unsigned telegram dated June 15, 1943, 12:45 p. m., stating: "Summary assessment [against the petitioner] is made and certified to you," was received by the collector of internal revenue for the third district of New York and a lien was filed by him against the petitioner on June 16, 1943.

The first notice of deficiency sent to the petitioner was dated June 18, 1943, and erroneously stated that he might file a petition to The Tax Court of the United States within 90 days. A second notice of deficiency was mailed to the petitioner on August 19, 1943, correcting the last paragraph of the first notice to read "150 days" instead of "90 days."

OPINION.

While the issues for the year 1937 are stated severally, they all depend on the one basic issue of fraud. The respondent asserts that the formation of Siva; the formal sale to it of the petitioner's literary products, both the existing works and those to be written during a four-year period; and the transactions between it and the literary agents or representatives in the United States, were all parts of a fraudulent scheme devised to evade the payment of the petitioner's just income taxes then due, or to become due, on his subsequent earnings. The burden of proving fraud is, by statute, on the respondent. If he has failed to do so, all the other issues become moot.

The record contains a rather complex and casual presentation of collateral facts and exhibits from which the respondent seeks to maintain his position. We do not discuss in detail the evidence and the inferences and arguments therefrom in which counsel of both the petitioner and the respondent have indulged. It is sufficient to state that we conclude that the respondent has failed wholly to sustain his burden of proof.

In 1934 the petitioner sold his existing works and his literary output for the ensuing four years to Siva, a Swiss corporation. That corporation had Swiss officers and its place of business was in Zurich. There is no evidence or even intimation that the petitioner owned any of its stock or had other means of controlling it. In the years prior to 1937 the respondent had treated the petitioner and Siva as wholly separate taxable entities and had collected taxes from each of them on that basis.

The record does not show Siva's financial condition at any time. Although its nominal capital was only approximately $6,000, it may have acquired earned or paid-in surplus. The validity of the contract between the petitioner and Siva has not been attacked. For aught we know, Siva may have carried on an extensive business entirely independent of its transactions with the petitioner. In fact, Siva is called a "trading corporation" in the record, which also sets forth various incidents of independent conduct in Siva's dealings with its American representatives and American publishers. There is no proof that Siva was not organized and operated for legitimate business purposes.

The respondent stresses certain correspondence between the petitioner's former literary agents (then Siva's agents) in the United States and Siva and its representatives abroad, as tending to establish fraud. In the light of contemporaneous explanations contained in the letters themselves and of other facts of record, we see no sinister significance in any of such evidence. The respondent has not proved his charge of fraud.

The amounts paid to Siva in 1937 for the petitioner's literary works, aggregating $56,689.41, were reported by Siva in its income tax return for that year. That action is proper. Under the terms of its contract of April 26, 1934, with the petitioner, those payments were the property of Siva and are not includible in the petitioner's income. "Miscellaneous adjustments" in the sum of $4,999.50 were added to the petitioner's income by the respondent and, in the absence of objection by the petitioner, are properly chargeable to him. However, they do not amount to 25 per cent of his gross income and hence section 275 (c), Internal Revenue Code,[1] is not applicable and the statute of limitations established in section 275 (a)[1] prevents the assessment of the tax.

The other issues fall with our decision against the respondent on the question of fraud.

### The Year 1938.

*Issues:*

(1) The applicability of the statute of limitations, under section 275 (c);

(2) The taxability to the petitioner or to his wife of payments for serial rights to novels and other literary works of which the petitioner was the author;

(3) The inclusion in income of lump sum payments for literary productions;

(4) The allocation of income between sources within and without the United States;

(5) The disallowance of attorneys' fees.

#### FINDINGS OF FACT.

In the fall of 1936, on his way to Hollywood, California, the petitioner consulted his attorney, Washburn (and his partner, Malone), relative to his income tax status. Washburn advised the petitioner regarding the taxability of his salary. The petitioner then went to Hollywood and remained there for about a year. While there the petitioner wrote to Washburn in connection with his income tax return for the year 1936, filed in Hollywood on a community property basis. The petitioner considered that his entry into the United States under

---

[1] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.

Except as provided in section 276—

(a) GENERAL RULE.—The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

\* \* \* \* \* \* \*

(c) OMISSION FROM GROSS INCOME.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.

a quota visa made him a resident of this country. Washburn questioned that status, but suggested that if the petitioner were resident of France the community property law of that country would govern and a community property return would be proper.

When the petitioner and his wife, Ethel Wodehouse, came East in the fall of 1937 they consulted Washburn again and were advised to consult their counsel in England with reference to their community property status. The petitioner stated that he and his wife had no agreement that would prevent a community property return; that they actually had a joint account usually; and had "no objection whatever to an equal share of their worldly gains." Washburn then advised them that if the petitioner wished to give his wife half of his property "he probably could achieve the same result as the community property jurisdiction by making a present to her of a half interest in his writings, if he did so before any income was realized from them." The petitioner acquiesced in the suggestion of his attorney. The assignment of January 3, 1938, was drafted by the petitioner's attorney.

After the petitioner returned to England he informed Washburn that his English barrister told him that he was domiciled in England. Thereupon Washburn prepared amended returns for the petitioner on a separate property basis and the petitioner paid the required additional tax. Mrs. Wodehouse applied for a refund of the tax paid by her.

On January 12, 1938, Washburn received from Mrs. Wodehouse an assignment dated January 3, 1938, transferring to her an undivided one-half interest in the literary property, right, title, and interest in and to a manuscript of an unpublished novel entitled "The Cow-Creamer," together with all profits arising from printing, publishing and selling it in serial or book form, in newspapers and magazines, and from all dramatic, radio, motion pictures, etc., rights therein.

On October 15, 1938, Washburn received a similar assignment dated September 1, 1938, from the petitioner to his wife, of a one-half interest in the copyright of, and the property in, a manuscript entitled "Uncle Fred in the Springtime." Upon the receipt of the above assignments Washburn duly notified the petitioner's literary agent, Reynolds, to make any contracts and payments from the sale of the novels for the joint benefit of the petitioner and his wife.

On October 22, 1937, the Reynolds Agency sent part of "The Cow-Creamer" (also known as "The Silver Cow") to the Saturday Evening Post (Curtis Publishing Co.) and on February 5, 1938, delivered the remainder thereof to that company. On February 22, 1938, the Curtis Publishing Co. accepted the story "The Cow-Creamer" and sent its check for $40,000 to the Reynolds agency on the same date. The memorandum of acceptance contains the following language:

This check is offered and accepted with the understanding that The Curtis Publishing Company buys all rights in and of all stories and special articles appearing in its publications and with the further understanding that every number of these publications in which any portion thereof shall appear shall be copyrighted at its expense. After publication in a Curtis periodical is completed it agrees to reassign to the author on demand all rights, except American (including Canadian and South American) serial rights.

### MOTION-PICTURE RIGHTS

Please note that our reservation of serial rights (which includes publication in one installment) includes new story versions based on motion-picture or dramatic scenarios of short stories and serials that have appeared in Curtis publications, and that we permit the use of such versions only under the following conditions: * * * When selling motion-picture or dramatic rights of matter, you must notify the producer to this effect, so that there may be no misunderstanding on his part and no infringement of our rights.

The Reynolds Agency remitted to the petitioner and to his wife each the sum of $17,100, after deducting commissions and taxes. The book rights to "The Cow-Creamer" were sold to Doubleday, Doran & Co. for $5,000.

On December 13, 1938, the Curtis Publishing Co. accepted the story "Uncle Fred in the Springtime," subject to the same agreement of reassignment of rights as that contained in its acceptance of "The Cow-Creamer," and paid $40,000 therefor. The Reynolds Agency sent to the petitioner and to his wife each $17,000 to cover the proceeds thereof, less charges. "The Silver Cow" was published from July 9 to September 3, 1939, and "Uncle Fred in the Springtime" was published from April 22 to May 27 of that year.

The net paid average circulation of the Saturday Evening Post was as follows:

Six months ended December 31, 1937:
    Within United States _____ 3,037,562
    Outside United States (including Canada) _____ 189,867
Six months ended June 30, 1938:
    Within United States _____ 3,095,355
    Outside United States (including Canada) _____ 191,228
Six months ended December 31, 1938:
    Within United States _____ 3,061,009
    Canada _____ 139,739
    Miscellaneous and foreign _____ 54,985
Six months ended June 30, 1939:
    Within United States _____ 3,104,208
    Canada _____ 146,002
    Miscellaneous and foreign _____ 52,648

During 1938 the petitioner paid to Washburn, or his firm, $753.01 for legal services in connection with his handling the petitioner's literary affairs and for advice concerning the preparation of the petitioner's income tax returns. Approximately one-half of this amount was paid

for services relating to income taxes. No part of such sum was for advice as to the assignments of property to the petitioner's wife.

The applicability of the statute of limitations (sec. 275 (c)) is dependent upon the determination of the second issue, since the inclusion of the amounts paid to the petitioner's wife, in his income concededly increases his income more than the statutory 25 per cent. Therefore, we first consider whether or not such payments may properly be charged to the petitioner's income.

The respondent does not challenge the form of the assignments executed by the petitioner transferring to his wife one-half of his interest in "The Cow-Creamer" and "Uncle Fred in the Springtime," but he does contend that such assignments were designed solely to prevent the taxation of all the petitioner's income to him. A careful and comprehensive study of the entire record before us leads to the conclusion that the respondent's contention is well founded.

It is axiomatic that a taxpayer may take all proper measures to reduce his tax liability. The question is, Under the circumstances, were the measures proper? It is unnecessary to recount all of the facts leading up to the assignments made by the petitioner to his wife in the taxable year. It is enough to note that they lacked the merit of reality.

The specific consideration which impelled the assignments was the community property return with which the petitioner apparently became acquainted in California. With entire frankness, the petitioner's attorney recited the genesis of the assignments and the reasons therefor. He freely stated that the equivalent of a community property status *"probably"* could be accomplished by the petitioner's making a present to his wife of a half interest in his writings—prior to the realization of income therefrom.

Thus the petitioner's primary motivating purpose—and in fact the only purpose reflected in the record—was to divide his tax burden with his wife and so to reduce the amount of their aggregate taxes. Neither the petitioner nor his wife was present to testify as to the interest in the assignment and the circumstances surrounding it. To be effective a gift must be real. We find that no real donative intent prompted the petitioner's assignments to his wife. He attempted to utilize a pseudo gift in order to circumvent the prohibition against the filing of a community property income tax return in California by a nonresident alien. The means to accomplish this end originated with his attorney. He merely acquiesced in the method suggested and followed the routine and adopted the forms suggested by the attorney.

We observe the meticulous adherence to form which characterized

the tax-avoidance efforts. Notices of the alleged gift by assignment were sent to the petitioner's literary agent—even a photostat of the "assignment" was enclosed—and remittances and reports were made on the basis of a joint ownership of the stories. Such acts are expected to be consistent with the petitioner's theory of a genuine assignment but are of no probative worth when the assignment itself is ineffective for income tax purposes. We note, however, that the notices of acceptance issued by the Curtis Publishing Co., subsequent to the alleged assignments, contained the provision that after publication the company agreed to reassign *to the author*, on his demand, all rights, except certain serial rights.

It is significant that notice of the alleged joint ownership of the novels, serials, and stories sold to the Saturday Evening Post was not given to the publishing company, the one concern vitally interested in knowing the identity of the property owner to whom it was paying large sums of money. We conclude, therefore, that the proceeds of the novels and stories written by the petitioner and sold by his agents in 1938 are taxable to him. Since they amount to more than the 25 per cent prescribed in section 275 (c), that section applies to the taxable year and the statute of limitations has not tolled.

The third issue presents the taxability of lump sums paid for serial rights to literary works. This question is raised for the years 1940 and 1941 also, and will be discussed hereinafter.

The fourth issue, involving the allocation of income between sums derived from sources within and without the United States, is not supported by evidence relating to the year 1937, as admitted by the petitioner's counsel, and therefore is decided in favor of the respondent.

The amounts expended by the petitioner for legal services aggregating $753.01, are allowable deductions under the provisions of section 23 (a) (2). They were directly related to the production and collection of income, to the management of property held for the production of income, and to the preparation of the petitioner's income tax return. Regulations 103, art. 19.23 (a)–13, as amended by T. D. 5513 (May 14, 1946).

### The Years 1940 and 1941.

*Issues:*

(1) The inclusion in income of lump sum payments for literary works;

(2) The taxability to the petitioner or his wife of payments for serial rights to novels and other literary works of which the petitioner was the author (1940);

(3) The inclusion in income of payments for the use of literary property outside the United States;

(4) The disallowance of attorneys' fees.

FINDINGS OF FACT.

Under date of December 1, 1939, the petitioner executed a form of assignment to his wife of an undivided one-half interest in the manuscript entitled "Quick Service," together with a like interest in all rights thereto of every kind. The assignment was mailed to Washburn, who gave due notice thereof to the Reynolds Agency. On January 10, 1940, that agency received the manuscript of "Quick Service" and sent it to the Curtis Publishing Co., which accepted it on January 1, 1940, and sent to the agency its check for $40,000 in payment therefor. The memorandum of acceptance from the company was identical in form with that sent with its check for "The Cow-Creamer." The Reynolds Agency remitted to the petitioner and his wife each the sum of $17,000, after deducting commissions and costs. The novel was published by the Saturday Evening Post from March 4 to June 22, 1940. The book rights to the novel were sold to Doubleday, Doran & Co. for $5,000.

The net paid average circulation of the Saturday Evening Post was as follows:

Six months ended December 31, 1939:
 Within United States_____ 3,130,396
 Canada _____ 148,163
 Miscellaneous and foreign___ _____ 52,230
Six months ended June 30, 1940:
 Within United States_____ 3,231,496
 Canada _____ 153,291
 Miscellaneous and foreign_____ 52,196

On July 23, 1941, the Reynolds Agency sold to Hearst's International-Cosmopolitan Magazine all the American and Canadian serial rights to an article entitled "My Years Behind Barbed Wire," written by the petitioner, for $2,000.

The net paid average circulation of Hearst's International-Cosmopolitan was as follows:

Six months ended June 30, 1941:
 Within United States_____ 1,850,014
 Canada _____ 41,705
 Miscellaneous and foreign_____ 21,618
Six months ended December 31, 1941:
 Within United States_____ 1,961,600
 Canada _____ 49,436
 Miscellaneous and foreign_____ 24,164

On August 12, 1941, the Reynolds Agency sold to Curtis Publishing Co. all North American (including Canadian) serial rights to "Money in the Bank," a novel written by the petitioner, for $40,000.

The net paid average circulation of the Saturday Evening Post was as follows:

Six months ended June 30, 1941:
  Within United States_____ 3, 328, 875
  Canada _____ 121, 307
  Miscellaneous and foreign_____ 43, 019
Six months ended December 31, 1941:
  Within United States_____ 3, 425, 025
  Canada _____ 122, 049
  Miscellaneous and foreign_____ 57, 546

In 1941 the petitioner paid Washburn or his firm $1,661.82 for legal services in connection with his handling the petitioner's literary affairs and for advice relating to, and for the preparation of, the petitioner's income tax returns. Approximately one-half of this amount was paid for the income tax services.

OPINION.

The first issue, found also in the year 1938, presents the question of the taxability of lump sum payments for serial rights to literary works. Counsel for the petitioner concedes that substantially the same issue was raised and decided in *Sax Rohmer*, 5 T. C. 183; affd., 153 Fed. (2d) 61; certiorari denied, 328 U. S. 862.

In *Sax Rohmer, supra*, we held that the lump sum payments for serial rights were royalties and, as such, were taxable to the recipient. The arguments advanced in the cases at bar follow the same pattern as those appearing in the *Sax Rohmer* case, as presented to this Court and to the Circuit Court of Appeals. The petitioner's contentions were rejected in both courts and for the same reasons stated in the opinions therein, they are rejected here.

The facts on which the second issue is predicated are identical in character with those relating to the second issue in the year 1938. As we have there held, payments for serial rights to novels and for other literary works of the petitioner made during the taxable years, are taxable to him.

The third issue involves the inclusion in income of payments for the alleged use of literary property outside of the United States. If a specific portion of the amounts paid for serial rights is allocable and attributable to the Canadian circulation of the magazine which published the novels and articles, then such portion is not includible in the petitioner's income. (Sec. 119 (c) and sec. 211 (a) (1) (A), I. R. C.)

This question was also presented in *Sax Rohmer, supra*. There we said:

At the time the licensing agreement was settled upon, the parties apparently made no effort to segregate the value paid for the United States rights from that paid for the Canadian rights. The circulation figures do not furnish a sufficient basis upon which we could determine that any of the income was derived from

sources outside the United States. Since there is no basis upon which we could properly make any allocation, it follows that the full amount must be deemed to be from sources within the United States.

See also *Estate of Alexander Marton*, 47 B. T. A. 184.

So here, there is no evidence of record disclosing that when the publishing company accepted the stories of the petitioner under the agreement indicated in the memoranda of acceptance, it and the petitioner (or the petitioner's agent), made any effort to segregate the value of the Canadian rights from the United States rights. In the cases at bar, the petitioner offered testimony showing the relative circulation of the magazines in the United States and Canada, the dates of publication of the literary productions, and the opinion of the literary agent as to the value of the Canadian rights. These collateral evidential facts do not afford us a reliable basis for assigning and fixing a value, if any, to the Canadian rights. The parties to the contract were best able to make a proper allocation and segregation of the respective values. They neglected or chose not to do so. The omission, or failure, of such proof can not be corrected by a guess as to the value of a right which may have no value at all. We sustain the respondent's contention on this issue.

The fourth issue, relating to attorney fees, presents the same question as that involved in the fifth issue for the year 1938. The evidence supporting the petitioner's contention relating to the taxable year is similar to that in the prior year. Therefore, as there held, the sum of $1,661.82 is an allowable deduction for these taxable years, under the provisions of section 23 (a) (2).

*Decisions will be entered under Rule 50.*