# COMMISSIONER OF INTERNAL REVENUE *v.*
## WODEHOUSE.

No. 84.   Argued December 10, 13, 1948.—Decided June 13, 1949.

370

*Melva M. Graney* argued the cause for petitioner. With her on the brief were *Solicitor General Perlman, Assistant Attorney General Caudle, Ellis N. Slack* and *Lee A. Jackson.*

*Watson Washburn* argued the cause and filed a brief for respondent.

Mr. Justice Burton delivered the opinion of the Court.

The question before us is whether certain sums received in 1938 and 1941, by the respondent, as a nonresident alien author not engaged in trade or business within the United States and not having an office or place of business therein, were required by the Revenue Acts of the United States to be included in his gross income for federal tax purposes. Each of these sums had been paid to him in advance and respectively for an exclusive serial or book right throughout the United States in relation to a specified original story written by him and ready to be copyrighted. The answer turns upon the meaning of "gross income from sources within the United States" as that term was used, limited and defined in §§ 212 (a), 211 and 119 of the Revenue Act of 1938, and the Internal Revenue Code, as amended in 1940 and 1941.[1] For the reasons hereinafter stated, we hold that these sums each came within those kinds of gross income from sources within the United States that were referred to in those Acts as "rentals or royalties for the use of or for the privilege of using in the United States . . . copyrights, . . . and other like property,"[2] and that, accordingly, each of these sums was taxable under one or the other of those Acts.

The respondent, Pelham G. Wodehouse, at the times material to this case, was a British subject residing in

---

[1] The material provisions were identical in the Revenue Act of 1938, enacted May 28, 1938, c. 289, 52 Stat. 447, *et seq.*, and in the Internal Revenue Code, enacted February 10, 1939, 53 Stat. 1, *et seq.* Amendments to these provisions in 1940 and 1941 changed only the rates of the taxes. For text of the material provisions, see Appendix A, *infra,* pp. 395, 397, following this opinion.

[2] § 119 (a) (4), 52 Stat. 504, 53 Stat. 54, 26 U. S. C. § 119 (a) (4). For full text of the material provisions of § 119, see Appendix A, *infra,* p. 397.

France. He was a nonresident alien of the United States not engaged in trade or business within the United States and not having an office or place of business therein during either the taxable year 1938 or 1941. He was a writer of serials, plays, short stories and other literary works published in the United States in the Saturday Evening Post, Cosmopolitan Magazine and other periodicals.

February 22, 1938, the Curtis Publishing Company (here called Curtis) accepted for publication in the Saturday Evening Post the respondent's unpublished novel "The Silver Cow." The story had been submitted to Curtis by the respondent's literary agent, the Reynolds Agency, and, on that date, Curtis paid the agency $40,000 under an agreement reserving to Curtis the American serial rights in the story, including in such rights those in the United States, Canada and South America. The memorandum quoted in Appendix B, *infra*, p. 398, constituted the agreement. Also in 1938, the respondent received $5,000 from Doubleday, Doran & Company for the book rights in this story. The story was published serially in the Saturday Evening Post, July 9 to September 3, 1939.

Pursuant to a like agreement, the respondent received $40,000 from Curtis, December 13, 1938, for serial rights in and to his story "Uncle Fred in the Springtime." It was published serially in the Saturday Evening Post, April 22 to May 27, 1939.

July 23, 1941, Hearst's International Cosmopolitan Magazine, through the respondent's same agent, paid the respondent $2,000 for "all American and Canadian serial rights (which include all American and Canadian magazine, digest, periodical and newspaper publishing rights)" to the respondent's article entitled "My Years Behind Barbed Wire." The agreement appears in Appendix C,

*infra,* p. 400. Apparently this story was published shortly thereafter.

August 12, 1941, Curtis, tnrough the same ·agent, paid the respondent $40,000 for the "North American (including Canadian) serial rights" to respondent's novel entitled "Money in the Bank." The agreement was in the form used by Curtis in 1938.[3] The evidence does not state that this story was published but it shows that Curtis, pursuant to its agreements, took out a United States copyright on each of the respective stories named in the foregoing agreements. After each story's serial publication, Curtis reassigned to the respondent, on the latter's demand, all rights in and to the story excepting those rights which the respondent expressly had agreed that Curtis was to retain. The respective sums were thus paid to the respondent, in advance and in full, for the serial or book rights which he had made available. For United States income tax purposes, the respondent's literary agent, or some other withholding agent, withheld from the respondent, or from his wife as his assignee, a part of each payment.

In 1944 the Commissioner of Internal Revenue, petitioner herein, gave the respondent notice of tax deficiencies assessed against him for the taxable years 1923, 1924, 1938, 1940 and 1941. In these assessments, among other items, the Commissioner claimed deficiencies in the respondent's income tax payments based upon his above-described 1938 and 1941 receipts. The respondent, in a petition to the Tax Court for a redetermination of such deficiencies, not only contested the additional taxes assessed against him, which were based upon the full amounts of those receipts, but he asked also for the refund to him of the amounts which had been withheld, for

---

[3] See Appendix B, *infra,* p. 398.

income tax purposes, from each such payment. The Tax Court entered judgment against him for additional taxes for 1938, 1940 and 1941, in the respective amounts of $11,806.71, $8,080.83 and $1,854.85. In speaking of the taxes for 1940 and 1941, the Tax Court said:

"The first issue, found also in the year 1938, presents the question of the taxability of lump sum payments for serial rights to literary works. Counsel for the petitioner [Wodehouse, the respondent here] concedes that substantially the same issue was raised and decided in *Sax Rohmer,* 5 T. C. 183; affd., 153 Fed. (2d) 61; certiorari denied, 328 U. S. 862.

"In *Sax Rohmer, supra,* we held that the lump sum payments for serial rights were royalties and, as such, were taxable to the recipient. The arguments advanced in the cases at bar follow the same pattern as those appearing in the *Sax Rohmer* case, as presented to this Court and to the Circuit Court of Appeals. The petitioner's contentions were rejected in both courts and for the same reasons stated in the opinions therein, they are rejected here." 8 T. C. 637, 653.

As the respondent's taxes for 1938 and 1941 had been paid to the Collector of Internal Revenue at Baltimore, Maryland, his petition for review of the Tax Court's judgment for those years was filed in the United States Court of Appeals for the Fourth Circuit. The judgment against him was there reversed, 166 F. 2d 986, one judge dissenting on the authority and reasoning of *Rohmer* v. *Commissioner,* 153 F. 2d 61 (C. A. 2d Cir.). Because of the resulting conflict between the Circuits and also because comparable issues as to this respondent's taxes for 1940 were pending before the Court of Appeals for

the Second Circuit, we granted certiorari. 335 U. S. 807.[4]

The petitioner contends that receipts of the type before us long have been recognized as rentals or royalties paid for the use of or for the privilege of using in the United States, patents, copyrights and other like property. Keeping in mind that, before 1936, such receipts were expressly subject to withholding as part of the taxable income of nonresident alien individuals, he contends that those receipts remained taxable and subject to withholding in 1938 and 1941, after the standards for taxation of such aliens had been made expressly coterminous with the standards for subjecting this part of their income to withholding procedures.

In opposition, the respondent argues, first, that each sum he received was a payment made to him in return for his sale of a property interest in a copyright and not a payment to him of a royalty for rights granted by him under the protection of his copyright. Being the proceeds of a sale by him of such a property interest, he concludes that those proceeds were not required to be included in his taxable gross income because the controlling Revenue

---

[4] As the court below held that the respondent's 1938 and 1941 receipts were not subject to taxation, it did not reach the subsidiary issues which had been raised as to the proper amount of those taxes if they were sustained. Similarly, the court below did not pass upon the claim that certain of the assessments were subject to the three-year statute of limitations rather than the five-year statute here applied. See § 275 (a) and (c), 52 Stat. 539, 53 Stat. 86, 26 U. S. C. § 275 (a) and (c). This claim turned upon the recognition to be given to certain assignments made by the respondent to his wife. Those assignments, if fully recognized, might have reduced the tax to be assessed against the respondent to an amount less than 25% of the amount originally stated by him in his return and thus rendered the five-year statute inapplicable. However, the effect of those assignments was not passed upon by the court below.

Acts did not attempt to tax nonresident alien individuals, like himself, upon income from sales of property. Secondly, the respondent argues that, even if his receipts were to be treated as royalties, yet each was received in a single lump sum and not "annually" or "periodically," and that, therefore, they did not come within his taxable gross income.

The petitioner replies that, in this case, we do not properly reach the fine questions of title, or of sales or copyright law, thus raised by the respondent as to the divisibility of a copyright or as to the sale of some interest in a copyright. The petitioner states that the issue here is one of statutory interpretation. It is confined primarily to the taxability of the respondent's receipts within the broad, rather than narrow, language of certain Revenue Acts. Attention must be focused on those Revenue Acts. If *their* terms made these receipts taxable because of the general nature of the transactions out of which the receipts arise, namely, payments for the use of or for the privilege of using copyrights, then it is *those* statutory definitions, properly read in the light of *their* context and of *their* legislative history, that must determine the taxability of the receipts. He argues that the language of the Revenue Acts does not condition the right of the United States to its revenue upon any fine point of property law but covers these receipts in any event. Treating the respondent's receipts simply as representing payments for the use of or the privilege of using copyrights the petitioner argues that they constituted income that was subject both to withholding and to taxation in 1938 and 1941. He claims finally that the respondent cannot escape taxation of such receipts merely by showing that each payment was received by him in a lump sum in advance for certain uses of a copyright, instead of in several payments to be made at intermediate dates during the life of the copyright.

## I.

*Sums received by a nonresident alien individual for the use of a copyright in the United States constituted gross income taxable to him under the Revenue Act of 1938 and the Internal Revenue Code.*

Under the income tax laws of the United States, sums received by a nonresident alien author not engaged in trade or business within the United States and not having an office or place of business therein long have been required to be included in his gross income for our federal tax purposes. Such receipts have been an appropriate and readily collectible subject of taxation. A review of the statutes, regulations, administrative practices and court decisions discloses this policy and, at least from a revenue standpoint, no reason has appeared for changing it.

Since the early days of our income tax levies, rentals and royalties paid for the use of or for the privilege of using in the United States, patents, copyrights and other like property have been taxed to nonresident aliens and for many years at least a part of the tax has been withheld at the source of the income. To exempt this type of income from taxation in 1938 or 1941, in the face of this long record of its taxation, would require a clearness and positiveness of legislative determination to change the established procedure that is entirely absent here.

The policy of this Court in this general field of statutory interpretation was stated in 1934 in a case which dealt with the taxation of a somewhat comparable form of income of a foreign corporation. In *Helvering* v. *Stockholms Enskilda Bank,* 293 U. S. 84, the question presented was that of the proper interpretation to be given to § 217 (a) (1) of the Revenue Act of 1926, c. 27, 44 Stat. 9, 30 (analogous to § 119 (a) (1) of the Revenue Act of 1938, 52 Stat. 503, now before us). Certain sums

had been received by a foreign corporation from the United States Government in the form of interest upon a refund of an overpayment by that corporation of its income taxes. This Court held that such interest, in turn, constituted taxable gross income derived by the foreign corporation from a source within the United States, because it amounted to interest upon an interest-bearing obligation of a resident of the United States within the meaning of the Act. This interpretation was adopted in opposition to the foreign corporation's argument that the payment should be exempted because it amounted to interest on one of the "obligations of the United States" and that interest on such an obligation was expressly exempted from taxation by § 213 (b) (4) of the Revenue Act of 1926 (analogous to § 22 (b) (4) of the Revenue Act of 1938). This Court distinguished between the meaning of the word "obligations" in the context of the different sections of the Act and stated the applicable general principles of statutory construction as follows:

> "The general object of this act is to put money into the federal treasury; and there is manifest in the reach of its many provisions an intention on the part of Congress to bring about a generous attainment of that object by imposing a tax upon pretty much every sort of income subject to the federal power. Plainly, the payment in question constitutes income derived from a source within the United States; and the natural aim of Congress would be to reach it. In *Irwin* v. *Gavit,* 268 U. S. 161, 166, this court, rejecting the contention that certain payments there involved did not constitute income, said: 'If these payments properly may be called income by the common understanding of that word and the statute has failed to hit them it has missed so much of the general purpose that it expresses at the start. Congress intended to use its power to the full extent.

*Eisner* v. *Macomber,* 252 U. S. 189, 203.' Although Congress intended, as the court held in the *Viscose* case, *supra* [56 F. 2d 1033 (C. A. 3d Cir.)], to include interest on a tax refund made to a *domestic* corporation, we are asked to deny such intention in respect of a competing *foreign* corporation. But we see nothing in the relationship of a foreign corporation to the United States, or in any other circumstance called to our attention, which fairly shows that such a discrimination was within the contemplation of Congress. On the contrary, the natural conclusion is that if any discrimination had been intended it would have been made in favor of, and not against, the domestic corporation, which contributes in a much more substantial degree to the support of the people and government of the United States." *Id.* at pp. 89–90.

And further:

"In the foregoing discussion, we have not been unmindful of the rule, frequently stated by this court, that taxing acts 'are not to be extended by implication beyond the clear import of the language used,' and that doubts are to be resolved against the government and in favor of the taxpayer. The rule is a salutary one, but it does not apply here. The intention of the lawmaker controls in the construction of taxing acts as it does in the construction of other statutes, and that intention is to be ascertained, not by taking the word or clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, the occasion and circumstances of its use, and other appropriate tests for the ascertainment of the legislative will. Compare *Rein* v. *Lane,* L. R. 2 Q. B. Cases 144, 151. The

intention being thus disclosed, it is enough that the word or clause is reasonably susceptible of a meaning consonant therewith, whatever might be its meaning in another and different connection. We are not at liberty to reject the meaning so established and adopt another lying outside the intention of the legislature, simply because the latter would release the taxpayer or bear less heavily against him. To do so would be not to resolve a doubt in his favor, but to say that the statute does not mean what it means." *Id.* at pp. 93–94.

A. *These receipts unquestionably would have been taxed to a nonresident alien individual if received by him under the Revenue Act of 1934.*

The background and development of the particular provisions before us emphasize the congressional purpose to tax this type of income. They disclose the full familiarity of Congress with this general type of transaction. Throughout the history of our federal income taxes since the Sixteenth Amendment to our Constitution, the Revenue Acts have expressly subjected to taxation the income received by nonresident alien individuals from sources within the United States. For example, there is no doubt that the receipts here in question would have been taxable to the respondent if they had been received by him under the Revenue Act of 1934, c. 277, 48 Stat. 680, *et seq.*, and the present issue resolves itself largely into a determination of whether such receipts were relieved from taxation by the Revenue Act of 1936, c. 690, 49 Stat. 1648, *et seq.*, through certain changes in the income tax laws that were made by that Act and which were still in effect in 1938 and 1941.

Under the Revenue Act of 1934, the income of a nonresident alien individual was taxed at the same rates as was the income of a resident citizen (§§ 11 and 12) but

his taxable gross income was limited wholly to that which he had received "from sources within the United States," § 211 (a).[5] Such sources were described in § 119 of that Act, and the material portions of that Section have remained unchanged ever since. They give their own definition of rentals and royalties. ' These have been quoted from above and they are set forth in full in Appendix A, *infra*, p. 397. The Act of 1934 thus sought to include as taxable gross income any income which a nonresident alien individual received as royalties for the privilege of using any copyrights in the United States. and also sought to tax his income from the sale of any personal property which he had produced (in whole or in part) outside the United States but had sold within the United States. § 119 (a) (4) and (e) (2). As a mechanism of collection, the Act also sought to withhold . from nonresident alien individuals, at the source of payment, the entire normal tax of 4% computed upon numerous classifications of their income named in § 143 (b).[6]

---

[5] "SUPPLEMENT H—NONRESIDENT ALIEN INDIVIDUALS

"SEC. 211. GROSS INCOME.

"(a) GENERAL RULE.—In the case of a nonresident alien individual gross income includes only the gross income from sources within the United States." § 211 (a), 48 Stat. 735.

[6] "SEC. 143. WITHHOLDING OF TAX AT SOURCE.

"(a) TAX-FREE COVENANT BONDS.— . . .

"(b) NONRESIDENT ALIENS.—All persons, in whatever capacity acting, including lessees or mortgagors of real or personal property, fiduciaries, employers, and all officers and employees of the United States, having the control, receipt, custody, disposal, or payment of *interest* (except interest on deposits with persons carrying on the banking business paid to persons not engaged in business in the United States and not having an office or place of business therein), *rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income, of any nonresident alien individual,* or of any partnership not engaged in trade or business within the

This language is important in this case. It expressly included certain forms of interest and also *"rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income, of any nonresident alien individual, . . . ."* (Emphasis added.) While *royalties* were not mentioned specifically in this statutory withholding clause, they had been expressly listed in the Regulations, since long before 1934, so that there was no doubt that they were to be subject to withholding as a matter of interpretation. It was equally clear that *income derived from a sale* in the United States, of either real or personal property, was not included, either expressly or by implication or interpretation, in the income subject to a withholding of the tax on it at the source of the income. The Regulations, since the Act of 1924 (U. S. Treas. Reg. 65, Art. 362 (1924)) to the present time, have contained decisive statements on these points. Such Regulations have been substantially identical with the following which appeared in Treasury Regulations 86, Article 143–2 (1934):

> "Only fixed or determinable annual or periodical income is subject to withholding. The Act specifically includes in such income, interest, rent, salaries, wages, premiums, annuities, compensations, remunerations, and emoluments. *But other kinds of income are included, as, for instance, royalties.*
>
> ". . . *The income derived from the sale in the United States of property, whether real or personal, is not fixed or determinable annual or periodical income.*" (Emphasis added.)

United States and not having any office or place of business therein and composed in whole or in part of nonresident aliens, . . . deduct and withhold *from such annual or periodical gains, profits, and income a tax equal to 4 per centum thereof: . . . ."* (Emphasis added.) 48 Stat. 723–724.

Apart from these provisions requiring the withholding of taxes at the source of the income, the Revenue Acts have contained other provisions, in similar language, calling for the reporting to the Commissioner of Internal Revenue of material information as to certain income which might be taxable. This language has received an interpretation which is related to and consistent with that here given to the provisions as to withholding taxes.[7]

---

[7] "SEC. 147. INFORMATION AT SOURCE.

"(a). PAYMENTS OF $1,000 OR MORE.—*All persons, in whatever capacity acting,* including lessees or mortgagors of real or personal property, fiduciaries, and employers, *making payment to another person, of interest, rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable gains, profits, and income* . . . of $1,000 or more in any taxable year, . . . shall render a true and accurate return to the Commissioner, *under such regulations* and in such form and manner and to such extent as may be prescribed by him with the approval of the Secretary, . . . ." (Emphasis added.) 48 Stat. 726.

Treasury Regulation 86, under the Act of 1934, showed among other things, that this Section applied generally to fixed or determinable income, *that royalties were included as fixed and determinable income* and that information as to them was not required when such royalties did not exceed the taxpayer's exemptions. Also, such information at the source was not required where the income had been withheld, at the source, from a nonresident alien individual and a report had been made to that effect. See, for example:

"ART. 147–1. . . . Although to make necessary a return of information the income must be fixed or determinable, it need not be annual or periodical. . . ."

"ART. 147–3. Cases where no return of information required.—Payments of the following character, although over $1,000, need not be reported in returns of information . . . :

"(*h*) Payments of salaries, rents, *royalties*, interest (except bond interest required to be reported on ownership certificates), *and other fixed or determinable income* aggregating less than $2,500 made to a married individual; . . . ."

"ART. 147–5. Return of information as to payments to other than citizens or residents.—In the case of payments of fixed or determi-

These statutes and Regulations show that, under the Act of 1934, Congress sought to tax (and withhold all or part of the tax on) the income of a nonresident alien individual insofar as it was derived from payments for the use of or for the privilege of using copyrights in the United States. It also sought to tax (although it could not generally withhold the tax on) any gain which the taxpayer derived from the sale of personal property produced by him without the United States but sold within the United States. Accordingly, if the receipts now before us had been received by the respondent under the Act of 1934, they would have been taxable whether they were treated as payments in the nature of royalties for the use of the copyrights under § 119 (a) or were treated as payments of a sale's price for certain interests in copyrights under § 119 (e). The Regulations helpfully carried this analysis further. They showed that, while *both forms of income were taxable, yet it was only the royalty payments* (and not the sales' proceeds) *that were subject to the withholding procedure.* A Treasury Decision made in 1933, under the Revenue Acts extending from 1921 to 1928,[8] and a decision of the Court of Ap-

---

nable annual or periodical income to nonresident aliens (individual or fiduciary), . . . the returns filed by withholding agents on Form 1042 [required by Art. 143–8] shall constitute and be treated as returns of information. (See sections 143 and 144.)" (Emphasis added.)

[8] This opinion was rendered in response to a request to the Treasury for advice as to whether certain payments received during the years 1921 to 1928 by the taxpayer, a nonresident alien author, were taxable as income from sources within the United States. The payments were received pursuant to contracts granting certain volume, serial and motion picture rights in consideration of stipulated royalties payable in various ways. Some contracts prescribed a royalty on each copy sold, others a total stipulated sum, and, in at least one case, this sum was payable in several parts. The opinion reviewed the practice of many years and gave a positive answer to

peals for the Second Circuit made in 1938, under the
Revenue Act of 1928, c. 852, 45 Stat. 791, sustain the
above conclusions. The latter case was that of *Sabatini*
v. *Commissioner*, 98 F. 2d 753 (C. A. 2d Cir.),[9] later

---

guide future practice. The answer was that all these receipts were
taxable insofar as they came from sources within the United States.
The opinion contained the following significant statements which
indicate the administrative practice which had been applied and
thereafter was to apply to these Sections:

"The fact that a payment in the nature of a rent or royalty is
in a lump sum rather than so much per annum, per unit of property,
per performance, per book sold, or a certain percentage of the
receipts or profits, does not alter the character of the payment as
rent or royalty. (O. D. 1028, C. B. 5, 83; *Appeal of J. M. &
M. S. Browning Co.*, 6 B. T. A., 914, acquiescence C. B. VII–1, 5.)
Nor is it material whether the royalty is paid in advance. (*Appeal
of Bloedel's Jewelry, Inc.*, 2 B. T. A., 611.) It is accordingly the
opinion of this office that the payments in question are 'rentals
or royalties from . . . [or] for the use of or for the privilege of
using . . . copyrights . . . and other like property.' Since the grant
by the taxpayer in each instance is so clearly the grant of a par-
ticular right in all the rights constituting the taxpayer's literary
property and copyright, the conclusion is obvious that the grant
is a license and not a sale.

"The applicable Revenue Acts regard royalties from American
copyrights (or for the use of or for the privilege of using in the
United States copyrights and other like property) as income from
sources within the United States, and royalties from foreign copy-
rights (or for the use of or for the privilege of using without the
United States copyrights and other like property) as income from
sources without the United States. Substantially all the income here
in question constitutes royalties from, or for the use of, or for the
privilege of using American copyrights." I. T. 2735, XII–2 Cum.
Bull. 131 (1933).

[9] "The fact that one lump sum was received for the privilege of
using the property of the author instead of a series of payments
does not alter the real character of what the taxpayer received.
It was payment for the use of his literary property for the purpose
named and in so far as it was in payment for use in the United
States was taxable as a royalty paid in advance and received for
the granting of that privilege. While there seems to be no direct

discussed and approved in *Rohmer* v. *Commissioner,* 153 F. 2d 61, 63 (C. A. 2d Cir.). Incidentally, these opinions declared not only that the taxes in question were imposed upon the receipts as royalties but that it made no difference whether such royalties were each received in lump sums in full payment in advance, to cover the use of the respective copyrights throughout their statutory lives, or whether the royalties were received from time to time and in lesser sums.

B. *The Revenue Act of 1936 preserved the taxability of the several kinds of income of nonresident alien individuals which had been the subject of withholding at their respective sources, including receipts in the nature of royalties for the use of copyrights in the United States.*

The Revenue Act of 1936 did not change materially the statutory definition of gross income from sources within the United States under § 119. It did, however, amend § 211 (a)[10] materially in its description of the

authority for this view of the meaning of the statute, we believe it correct in principle and the order of the Board in this respect is reversed." *Id.* at p. 755. This decision effectively supplements the Treasury Bulletin of 1933 and emphasizes the general language of the statute in taxing proceeds of the type of transaction that is before us. It reversed an intermediate holding made by the Board of Tax Appeals in 1935 in *Sabatini* v. *Commissioner,* 32 B. T. A. 705. That intermediate decision, accordingly, was in the process of review when the Revenue Act of 1936 was enacted and, therefore, it cannot be argued that Congress carried its interpretation into the Revenue Act of 1936. If anything, the contrary might be argued as to *Sabatini* v. *Commissioner,* 98 F. 2d 753 (C. A. 2d Cir.), which was decided before the enactment of the Internal Revenue Code.

[10] "SEC. 211. TAX ON NONRESIDENT ALIEN INDIVIDUALS.

"(a) No UNITED STATES BUSINESS OR OFFICE.—There shall be levied, collected, and paid for each taxable year, in lieu of the tax imposed by sections 11 and 12, upon the amount received, by every

taxable income of nonresident alien individuals. These amendments (1) substituted a special flat rate of 10% for the general normal tax and surtax rates, (2) required this entire special tax, in the usual case, to be withheld at the source of the taxable income, (3) limited the taxability of the income of each nonresident alien individual to those kinds of income to which the withholding provisions also applied; and (4) (except for the addition of dividends) inserted verbatim, as a new statement of the types of taxable income of a nonresident alien individual (not engaged in trade or business within the United States and not having an office or place of business therein), the language that previously had been used to state the specific types of income to which the withholding procedure was to apply. See its § 143 (b)[11] par-

nonresident alien individual not engaged in trade or business within the United States and not having an office or place of business therein, from sources within the United States as *interest* (except interest on deposits with persons carrying on the banking business), *dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income, a tax of 10 per centum of such amount, . . . .*" (Emphasis added.) 49 Stat. 1714.

[11] "SEC. 143. WITHHOLDING OF TAX AT SOURCE.

"(b) NONRESIDENT ALIENS.—All persons, in whatever capacity acting, including lessees or mortgagors of real or personal property, fiduciaries, employers, and all officers and employees of the United States, having the control, receipt, custody, disposal, or payment of *interest* (except interest on deposits with persons carrying on the banking business paid to persons not engaged in business in the United States and not having an office or place of business therein), *dividends, rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income (but only to the extent that any of the above items constitutes gross income from sources within the United States), of any nonresident alien individual,* or of any

alleling its amended § 211 (a). By thus restricting the income tax to those specific types of income to which the withholding procedure had previously applied, Congress automatically relieved nonresident alien individuals from the taxation of their income from certain sales of real or personal property, previously taxed. This Amendment, on the other hand, retained and increased the tax on the very kind of income that is before us. It also increased the portion of such income to be withheld at its source to meet the new and higher flat rate of tax.

The legislative history of the Revenue Act of 1936 confirms the special meaning thus apparent on its face. It emphasizes the policy which expressly marked the enactment of this Act, including particularly these Amendments. The practical situation was that it had been difficult for United States tax officials to ascertain the taxable income (in the nature of capital gains) which had been derived from sales of property at a profit by nonresident alien individuals, or by foreign corporations, when the respective taxpayers were not engaged in trade or business within the United States and did not have an office or place of business therein. This difficulty was in contrast to the ease of computing and collecting a tax from certain other kinds of income, including payments for the use of patents and copyrights, from which the United States income taxes were being, wholly or partially, withheld at the source. The Congressional Committee Reports expressed a purpose of Congress to limit future taxes on

---

partnership not engaged in trade or business within the United States and not having any office or place of business therein and composed in whole or in part of nonresident aliens, shall . . . *deduct and withhold from such annual or periodical gains, profits, and income a tax equal to 10 per centum thereof,* . . . ." (Emphasis added.) 49 Stat. 1700–1701.

nonresident alien individuals to those readily collectible.[12] With a view evidently to securing substantially as much revenue as before, Congress thereupon applied a new flat rate of 10% to nonresident alien individuals and of 15% to foreign corporations, the entire amount of this flat rate of tax to be withheld and collected at the source of the income. The reports referred also to increases in stock

---

[12] "NONRESIDENT ALIENS AND FOREIGN CORPORATIONS

"It has also been necessary to recommend substantial changes in our present system of taxing nonresident aliens and foreign corporations. . . . In section 211, it is proposed that the tax on a nonresident alien not engaged in a trade or business in the United States and not having an office or place of business therein, shall be at the rate of *10 percent on his gross income from interest, dividends, rents, wages, and salaries and other fixed and determinable income. This tax (in the usual case) is collected at the source by withholding as provided for in section 143. Such a nonresident will not be subject to the tax on capital gains, including gains from hedging transactions, as at present, it having been found impossible to effectually collect this latter tax.* It is believed that this exemption from tax will result in additional revenue from the transfer taxes and from the income tax in the case of persons carrying on the brokerage business. . . .

". . . In the case of a foreign corporation not engaged in trade or business within the United States and not having an office or place of business therein, it is proposed to levy a flat rate of tax of 15 percent on the gross income of such corporation from interest, dividends, rents, salaries, wages, and *other fixed and determinable income (not including capital gains).* This tax is to be collected in the usual case by withholding at the source. . . .

"It is believed that the proposed revision of our system of taxing nonresident aliens and foreign corporations will be productive of substantial amounts of additional revenue, since *it replaces a theoretical system impractical of administration in a great number of cases.*" (Emphasis added.) H. R. Rep. No. 2475, 74th Cong., 2d Sess. 9–10 (1936).

To the same effect, see S. Rep. No. 2156, 74th Cong., 2d Sess. 21, 23 (1936).

transfer taxes which might result from thus removing the income tax from profits of nonresident alien individuals on their stock sales. Congress recognized a value and a convenience in thus turning to the accessible, fixed and determinable income of nonresident aliens. There is no doubt that these steps sought to increase or at least to maintain the existing volume of revenue.[13] No suggestion appears that Congress intended or wished to relieve from taxation the readily accessible and long-established source of revenue to be found in the payments made to

---

[13] On the floor of the House, Representative Hill of Washington, of the Committee on Ways and Means, supporting these Amendments, said:

"We have placed a flat tax of 10 percent on nonresident aliens, that is, people not citizens of the United States and not residing in the United States, and this 10-percent tax is withheld at the source. We expect to get considerably more revenue out of both nonresident aliens and foreign corporations having no place of business or not engaged in trade or business in this country, than we have been getting under the present plan, because we are going to withhold it at the source, and not take a chance on their making a report of it, or having to send our representatives to some foreign country to find what their net income is, and seek to induce them to pay their tax." 80 Cong. Rec. 6005 (1936).

On the floor of the Senate, Senator King of Utah, a member of the Finance Committee and in charge of the bill, said, in supporting these Amendments:

"The House bill changes the method of taxing nonresident aliens and foreign corporations. A nonresident alien not engaged in a trade or business in the United States, or not having an office or place of business therein, is taxed at a flat rate of 10 percent on his income from interest, dividends, rents, wages, salaries, and other fixed or determinable income, which are collected at the source. . . . These nonresident aliens are exempted under the House bill from the tax on capital gains, including hedging transactions, it being found administratively almost impossible to collect the capital-gains tax in such cases. This exemption will result in increased revenue from transfer taxes or from the income tax in the case of persons carrying on the brokerage business." 80 Cong. Rec. 8650 (1936).

nonresident aliens for the use of patents or copyrights in the United States. Much less was any suggestion made that lump sum advance payments of rentals or royalties should be exempted from taxation while at the same time smaller repeated payments of rentals or royalties would be taxed and collected at the source of the income. To have exempted these nonresident aliens from these readily collectible taxes derived from sources within the United States would have discriminated in their favor against resident citizens of the United States who would be required to pay their regular income tax on such income, if treated as royalties within the meaning of our gross income provisions, or at least to pay a tax upon them as capital gains, if treated as income from sales of capital within the meaning of our capital gains provisions. No such purpose to discriminate can be implied.

Accordingly, at the time in 1936 when these Amendments were being enacted into § 211 (a), the provisions for taxing the gross income of nonresident alien individuals under the Revenue Act of 1934 already had been long and officially interpreted as covering receipts from royalties as expressly and broadly defined in § 119 (a) and subjected to withholding at the source of income under § 143 (b). The legislative history of the 1936 Amendments is, therefore, a refutation of any claim that Congress, at that time, was seeking to exempt such taxpayers from those appropriate and readily collectible items. On the other hand, that history shows that Congress was seeking to continue to tax, and even to increase the tax upon, those kinds of income which had been found to be readily withholdable at their respective sources. Accordingly, what Congress did was to incorporate the very language of the withholding provisions of § 143 (b) into the language of the taxing § 211 (a). The Regulations under § 143 (b), quoted above substantially as being in effect since 1924, had already settled that *roy-*

*alties were included in § 143 (b). The Treasury Bulletin
also showed that lump sum payments made in advance
for limited rights under copyrights were included in the
"royalties" thus subject to withholding and taxation.
The type of transactions and the kind of payments were
thus identified. The broad language there used is en-
titled to be interpreted in accordance with its plain mean-
ing and established usage. Therefore, after the 1936
Amendments, it became equally clear that these receipts
in the nature of royalties which were previously withheld
at their source were included in the sources of income
specified in § 211 (a) but that profits from sales of prop-
erty were not included in the sources of income specified
in § 211 (a) any more than they had been under § 143 (a).*
The decisions of the Court of Appeals of the Second Cir-
cuit in *Sabatini v. Commissioner, supra,* in 1938, in rela-
tion to the Revenue Act of 1928, and in *Rohmer* v. *Com-
missioner, supra,* in 1946, in relation to the Internal Rev-
enue Code, as amended in 1940, reflected the same point
of view.

None of these provisions of the Act of 1936 were
changed by the Revenue Act of 1938, the Internal Rev-
enue Code, or the 1940 or 1941 Amendments to that Code,
except in relation to the size of the tax rates. The prin-
cipal changes even in those rates were to provide higher
taxes in the higher brackets, rather than to reduce the
taxes on nonresident aliens.[14]

---

[14] Particularly in the Revenue Act of 1938, § 211 was amended
to provide that, if the aggregate amount of a taxpayer's income
of the types included from sources within the United States was
more than $21,600 during a taxable year, then the regular rate of
tax imposed by §§ 11 and 12 became applicable, subject to the
proviso that in no case it be less than 10% of the gross income
subject to the tax. § 211 (a) and (c), 52 Stat. 527–528, and see
Appendix A, *infra*, p. 395.

## II.

*The receipt of the respective amounts by the respondent in single lump sums as payments in full, in advance, for certain rights under the respective copyrights did not exempt those receipts from taxation.*

Once it has been determined that the receipts of the respondent would have been required to be included in his gross income for federal income tax purposes if they had been received in annual payments, or from time to time, during the life of the respective copyrights, it becomes equally clear tha'- the receipt of those same sums by him in single lump sums as payments in full, in advance, for the same rights to be enjoyed throughout the entire life of the respective copyrights *cannot,* solely by reason of the consolidation of the payment into one sum, render it tax exempt. No Revenue Act can be interpreted to reach such a result in the absence of inescapably clear provisions to that effect. There are none such here.

The argument for the exemption was suggested by the presence in §§ 211 (a) and 143 (b) of the words "annual" and "periodical." If read apart from their text and legislative history and supplemented by the gratuitous insertion after them of the word "payments," they might support the limiting effect here argued for them. However, when taken in their context, and particularly in the light of the legislative history of those Acts, and the interpretation placed upon them by the Treasury Department and the lower courts, they have no such meaning. Those words are merely generally descriptive of the character of the gains, profits and income which arise out of such relationships as those which produce readily withholdable interest, rents, royalties and salaries, consisting wholly of income, especially in contrast to gains, profits

and income in the nature of capital gains from profitable sales of real or personal property.[15]

In the instant case, each copyright which was to be obtained had its full, original life of 28 years to run after the advance payment was received by the author covering the use of or the privilege of using certain rights under it. Fixed and determinable income, from a tax standpoint, may be received either in annual or other payments without altering in the least the need or the reasons for taxing such income or for withholding a part of it at its source. One advance payment to cover the entire 28-year period of a copyright comes within the reason and reach of the Revenue Acts as well as, or even better than, two or more partial payments of the same sum.

Article 143–2 of Treasury Regulations 101, issued under the Revenue Act of 1938, provided:

> "The income need not be paid annually if it is paid periodically; that is to say, from time to time, whether or not at regular intervals. That the length of time during which the payments are to be made may be increased or diminished in accordance with someone's will or with the happening of an event does not make the payments any the less determinable or periodical."

Substantially this liberal language in the Regulations has been used in this connection since 1918. (U. S. Treas. Reg. 45, Art. 362 (1918).) Single lump sum payments of royalties were held to be taxable under the Revenue Acts of 1921, 1924, 1926 and 1928, I. T. 2735,

---

[15] ". . . While payment ordinarily is at a certain rate for each article or certain per cent of the gross sale, that in itself is not determinative. The purpose for which the payment is made and not the manner thereof is the determining factor." *Commissioner* v. *Affiliated Enterprises,* 123 F. 2d 665, 668 (C. A. 10th Cir.).

XII–2 Cum. Bull. 131 (1933); under the Revenue Act of 1928, *Sabatini* v. *Commissioner, supra;* and under the Internal Revenue Code, as amended in 1940, *Rohmer* v. *Commissioner; supra.*

For the foregoing reasons, we hold that the receipts in question were required to be included in the gross income of the respondent for federal income tax purposes. The judgment of the Court of Appeals accordingly is reversed and remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

Mr. Justice Douglas took no part in the consideration or decision of this case.

[For dissenting opinion of Mr. Justice Frankfurter, joined by Mr. Justice Murphy and Mr. Justice Jackson, see *post,* p. 401.]

### Appendix A.

Material provisions of §§ 212 (a), 211 and 119 of the Revenue Act of 1938 and the Internal Revenue Code:

"SEC. 212. GROSS INCOME.

"(a) General Rule.—*In the case of a nonresident alien individual gross income includes only the gross income from sources within the United States.*" (Emphasis added.)  52 Stat. 528, and 53 Stat. 76, 26 U. S. C. § 212 (a).

"SEC. 211. TAX ON NONRESIDENT ALIEN INDIVIDUALS.

"(a) No United States Business or Office.—

"(1) General rule.—There shall be levied, collected, and paid for each taxable year, in lieu of the tax imposed by sections 11 and 12 [normal tax and surtax imposed generally upon individuals and applicable in the instant case, under paragraphs (a) (2) and (c), because the respondent's gross income for each taxable year exceeded the allowable maximum there specified], upon the amount received, by every nonresident alien individual not engaged in trade or business within the United States and not having an office or place of business therein, *from sources within the United States as interest* (except interest on deposits

with persons carrying on the banking business), *dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income,* a tax of 10 per centum of such amount, . . . .

"(2) AGGREGATE · MORE THAN $21,600.—The tax imposed by paragraph (1) shall not apply to any individual if the aggregate amount received during the taxable year from the sources therein specified is more than $21,600.

"(c) NO UNITED STATES BUSINESS OR OFFICE AND GROSS INCOME OF MORE THAN $21,600.—A nonresident alien individual not engaged in trade or business within the United States and not having an office or place of business therein who has a gross income for any taxable year of more than $21,600 *from the sources specified in subsection (a) (1),* shall be taxable without regard to the provisions of subsection (a) (1), except that—

"(1) *The gross income shall include only income from the sources specified in subsection (a) (1);*

"(2) The deductions (other than the so-called 'charitable deduction' provided in section 213 (c)) shall be allowed only if and to the extent that they are properly allocable to the gross income from the sources specified in subsection (a) (1);

"(3) The aggregate of the normal tax and surtax under sections 11 and 12 shall, in no case, be less than 10 per centum of the gross income from the sources specified in subsection (a) (1); and . . . ." (Emphasis added.) 52 Stat. 527–528.

The above provisions of §§ 212 and 211 were reenacted in the Internal Revenue Code, 53 Stat. 76, 75–76. The tax rates were changed by the Revenue Act of 1940, c. 419, 54 Stat. 516–517 as follows: the surtaxes were increased generally in § 12 (b), the flat rates were increased from 10% to 15% and the allowable maximum income subject to the flat rates was raised from $21,600 to $24,000 in § 211 (a) and (c), 54 Stat. 518. The Revenue Act of 1941, c. 412, 55 Stat. 687, 688, again increased the surtaxes in § 12 (b), increased the flat rates from 15% to 27½% and decreased the allowable maximum income subject to the flat rates from $24,000 to $23,000 in § 211 (a) and (c), 55 Stat. 694. Since then, the normal tax and surtax rates have been increased still further, the flat rate applicable to nonresident alien individuals has been increased from 27½% to 30% and the allowable maximum income to which the flat rates apply has been reduced to $15,400. 26 U. S. C. § 211 (a) and (c).

## "SEC. 119. INCOME FROM SOURCES WITHIN UNITED STATES.

"(a) GROSS INCOME FROM SOURCES IN UNITED STATES.—The following items of gross income shall be treated as income from sources within the United States:

"(1) INTEREST.— . . .

"(2) DIVIDENDS.— . . .

"(3) PERSONAL SERVICES.— . . .

"(4) RENTALS AND ROYALTIES.—*Rentals or royalties from property located in the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using in the United States, patents, copyrights, secret processes and formulas, good will, trade-marks, trade brands, franchises, and other like property;* and

"(5) SALE OF REAL PROPERTY.—Gains, profits, and income from the sale of real property located in the United States.

"(6) SALE OF PERSONAL PROPERTY.—For gains, profits, and income from the sale of personal property, see subsection (e).

"(b) NET INCOME FROM SOURCES IN UNITED STATES.—From the items of gross income specified in subsection (a) of this section there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto and a ratable part of any expenses, losses, or other deductions which can not definitely be allocated to some item or class of gross income. The remainder, if any, shall be included in full as net income from sources within the United States.

"(c) GROSS INCOME FROM SOURCES WITHOUT UNITED STATES.—The following items of gross income shall be treated as income from sources without the United States:

"(1) Interest other than that derived from sources within the United States as provided in subsection (a) (1) of this section;

"(2) Dividends other than those derived from sources within the United States as provided in subsection (a) (2) of this section;

"(3) Compensation for labor or personal services performed without the United States;

"(4) *Rentals or royalties from property located without the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using without the United States, patents, copyrights, secret processes and formulas, good will, trade-marks, trade brands, franchises, and other like properties;* and

"(5) Gains, profits, and income from the sale of real property located without the United States.

"(d) Net Income From Sources Without United States.— . . .

"(e) Income From Sources Partly Within and Partly Without United States.— . . . Gains, profits, and income from—

"(1) transportation or other services rendered partly within and partly without the United States, or

"(2) *from the sale of personal property* produced (in whole or in part) by the taxpayer within and sold without the United States, or *produced (in whole or in part) by the taxpayer without and sold within the United States,*

shall be treated as derived partly from sources within and partly from sources without the United States. Gains, profits and income derived from the purchase of personal property within and its sale without the United States or from the purchase of personal property without and its sale within the United States, shall be treated as derived entirely from sources within the country in which sold, . . . .

"(f) Definitions.— . . . ." (Emphasis added.) 52 Stat. 503–506, 53 Stat. 53–55, 26 U. S. C. § 119.

## Appendix B.

## "THE CURTIS PUBLISHING COMPANY
### Independence Square
### Philadelphia

February 22, 1938

"Paul R. Reynolds, & Son
599 Fifth Avenue
New York City

We inclose herewith

our check Forty Thousand Dollars

in payment for

Serial: The Silver Cow
          By P. G. Wodehouse                    $40,000.00

### "Important

"This check is offered and accepted with the understanding that The Curtis Publishing Company buys all rights in and of all stories and special articles appearing in its publications and with the further understanding that every number of these publications in which any portion thereof shall appear shall be copyrighted at its expense. After publication in a Curtis periodical is completed it agrees to reassign to the author on demand all rights, except American (including Canadian and South American) serial rights.

"MOTION PICTURE RIGHTS

"Please note that our reservation of serial rights (which includes publication in one installment) includes new story versions based on motion-picture or dramatic scenarios of short stories and serials that have appeared in Curtis publications, and that we permit the use of such versions only under the following conditions: Such synopsis, scenario, or new story version shall not exceed fifteen hundred (1500) words in length when based on a short story appearing complete in one issue, or five thousand (5000) words when based on a serial appearing in two or more issues, or a series of not less than three connected short stories from which a single picture is to be made. Such synopsis shall appear only in circular matter, press books, press notices, trade journals and in magazines devoted exclusively to dramatic or motion-picture matter, and shall in no event appear as having been written by the author. When selling motion-picture or dramatic rights of matter, you must notify the producer to this effect, so that there may be no misunderstanding on his part and no infringement of our rights

"THE CURTIS PUBLISHING COMPANY"

Respondent's exhibit containing the foregoing memorandum agreement also included the statement rendered and the checks issued by the agent to the respondent and to the respondent's wife for $17,100 each, including the following:

"March 3, 1938

"P. G. Wodehouse

in account with

Paul R. Reynolds & Son

"Received from Saturday Evening Post *for All American, Canadian & South American serial rights to*

| | |
|---|---|
| THE SILVER COW | $40,000. |
| Commission 5% | 2,000. |
| | $38,000. |
| U. S. Income Tax 10% | 3,800. |
| | $34,200. |
| Ethel Wodehouse share ½ | 17,100. |
| Draft herewith | $17,100." |

(Emphasis added.)

No issue is before us relating to the computation of the amount withheld or the division of the payments between the respondent and his wife. In the statements rendered by the agent as to the payments received for serial rights to "Uncle Fred in the Springtime," the initial amount withheld was 10% of the full payment without deduction of the agent's commission.

## APPENDIX C.

### "HEARST'S INTERNATIONAL COSMOPOLITAN

Hearst Magazine Building

Fifty-seventh Street and Eighth Avenue
New York City

July 23, 1941
Jul 24 1941

"Mr. Paul R. Reynolds, Sr.
599 Fifth Avenue
New York City

"Dear Mr. Reynolds:
"This will confirm our purchase of the article entitled My Year Behind Barbed Wire by P. G. Wodehouse for Two Thousand Dollars ($2,000.00). *We are buying all American and Canadian serial rights (which include all American and Canadian magazine, digest, periodical and newspaper publishing rights).*
"It is understood and agreed that the author, and you as his agent, will not use or permit the use of this article or any part or parts thereof (1) in any manner or for any purpose until thirty (30) days after magazine publication and (2) in connection with or as the basis for any motion and/or talking picture(s), radio broadcast(s), television, dramatic production(s) or public performance(s) throughout the world unless the words 'Based on (or taken from) literary material originally published in Cosmopolitan' immediately precede or follow or otherwise accompany the title of any and all such motion and/or talking pictures, radio broadcasts, telecasts, dramatic productions or public performances.
"Your signature hereon will constitute an agreement between us.

"Sincerely yours,

"FRANCES WHITING
Frances Whiting

"ACCEPTED:

.....................,..;....

DATE:....................

"I am accepting the above letter on the condition that publication of this article can be released in England simultaneously with publication in Cosmopolitan Magazine (despite the wording of (1) in the second paragraph); with the further understanding that Cosmopolitan will permit no digest or newspaper publication of this article without the consent of the author or his agent in writing; and with the further condition that we receive payment not later than September 1, 1941." (Emphasis added.)

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE MURPHY and MR. JUSTICE JACKSON join, dissenting.

In the exercise of its power "To promote the Progress of Science and useful Arts," Congress, by granting copyrights, has created valuable property rights. See *American Tobacco Co. v. Werckmeister*, 207 U. S. 284; *White-Smith Music Pub. Co. v. Apollo Co.,* 209 U. S. 1, 18, 19. Because of a conflict between two Circuits we must now for the first time pass on the amenability to our revenue law of proceeds derived from the transfer of some of these interests. A ruling of the Treasury and a supporting decision of the Court of Appeals for the Second Circuit have made taxability turn on the notion that a copyright is indivisible. As a corollary it was assumed that a transfer of less than all the rights conferred by § 1 of the Copyright Law [1] makes the transaction, regardless of the intent of the parties, a "mere license." On that ground the Government has here pressed its claim of taxability. The Court of Appeals for the Fourth Circuit has rejected the notion of indivisibility and consequently found lump-sum payments by a purchaser of the exclusive serial publication rights—not to be within § 211

[1] 61 Stat. 652; 17 U. S. C. § 1.

(a) (1) (A) of the Internal Revenue Code. By the plain implication of its silence regarding the basis of the Government's claim and of the decisions that have heretofore sustained it, this Court likewise rejects the notion of indivisibility while clinging to a conclusion hitherto entirely derived from it.

The case calls for inquiry into the scheme of taxation of American income of alien copyright holders as well as review of administrative and judicial treatment of such income. To put this discussion in the perspective of concreteness, however, the facts out of which the controversy arises should first be stated. The transaction which produced the income found taxable by the Commissioner for the year 1941 is typical of the other transactions that yielded the proceeds claimed to be covered by § 211 (a) (1) (A) for the various tax years here involved.[2]

Wodehouse, the writer of popular stories and novels, a nonresident alien and "not engaged in trade or business within the United States," transferred, on August 12, 1941, through his American literary agent, to the Curtis Publishing Company for $40,000 "all rights in and of all stories and special articles appearing in its publications" of a certain novel, entitled, "Money in the Bank." The contract provided that, after publication in a Curtis magazine, Curtis was to reassign to Wodehouse "on demand all rights, except North American (including Canadian) serial rights." The documents involved in each of the various transactions make clear beyond question that Curtis, as buyer, intended to secure, if legally possible, an absolute, exclusive, and irrevocable transfer

---

[2] This particular year was selected because the Internal Revenue Code was then in effect, and this makes reference to the applicable statutory provisions easier. In 1941 Wodehouse also sold publication rights in an article to Hearst's International Cosmopolitan Co. The transaction was, in effect, similar to the one described in the text.

of the serial rights for all of North America, including Canada, and that Wodehouse, as transferor, intended to transfer, with no desire to retain any control whatsoever, all the North American serial rights of the novel. Indeed, to assure Curtis unqualified control, Wodehouse agreed to exercise other rights in a way to assure Curtis full protection and enjoyment in the serial publication rights.[3]

The Tax Court never questioned that these transactions were intended to be absolute transfers. Instead, it relied on *Sax Rohmer*, 5 T. C. 183, aff'd, 153 F. 2d 61 (C. A. 2d Cir.), which had held that an assignment of less than substantially all of the rights conferred by a copyright was necessarily only a license, and therefore that the proceeds received had to be regarded as for the use, rather than the sale, of the copyright. 8 T. C. 637. The Court of Appeals for the Fourth Circuit, upon full consideration of the *Rohmer* case, rejected its notion that there cannot be a sale of less than the whole, and, finding no barrier to the law's recognition of the true nature of the transaction, namely irrevocable transfers of an interest

---

[3] The memorandum of acceptance provided in part:

"Please note that our reservation of serial rights (which includes publication in one installment) includes new story versions based on motion-picture or dramatic scenarios of short stories and serials that have appeared in Curtis publications, and that we permit the use of such versions only under the following conditions: Such synopsis, scenario, or new story version shall not exceed fifteen hundred (1500) words in length when based on a short story appearing complete in one issue, or five thousand (5000) words when based on a serial appearing in two or more issues, or a series of not less than three connected short stories from which a single picture is to be made. Such synopsis shall appear only in circular matter, press books, press notices, trade journals and in magazines devoted exclusively to dramatic or motion-picture matter, and shall in no event appear as having been written by the author. When selling motion-picture or dramatic rights of matter, you must notify the producer to this effect, so that there may be no misunderstanding on his part and no infringement of our rights."

in personal property, reversed the Tax Court. 166 F. 2d 986 (C. A. 4th Cir.) (one judge dissenting).

This Court now reverses the Court of Appeals without facing the question which the Treasury, the Tax Court, and the two Courts of Appeals deemed controlling on each occasion when the problem was presented. Instead, the Court appears to be guided, in however low a key that consideration is pitched, in construing the applicable provisions of the Internal Revenue Code by the urgent need for revenue. To let this need determine judicial construction of the Internal Revenue Code would largely dispense with explicitness and technical precision in revenue measures. "Long prior practice" is invoked to support the fiscal considerations. This reliance is illusory. It completely ignores that the practice of which we have been advised is tenuous and, in any event, rests solely on the notion of the indivisibility of copyrights. To derive the existence of a practice from a single pronouncement by the Treasury, constituting not the formulation of a fiscal policy but expressing a metaphysical view of copyright law not adopted by this Court, gives a very loose meaning to the word "practice."

1. The Commissioner here determined a deficiency and the Tax Court sustained the deficiency under § 211 (c) (1).[4] That section deals with gross incomes of more than $24,000 received by nonresident aliens "not engaged

---

[4] "SEC. 211. TAX ON NONRESIDENT ALIEN INDIVIDUALS.

.    .    .    .    .    .

"(c) No UNITED STATES BUSINESS OR OFFICE AND GROSS INCOME OF MORE THAN $24,000.—A nonresident alien individual not engaged in trade or business within the United States and not having an office or place of business therein who has a gross income for any taxable year of more than $24,000 from the sources specified in subsection (a) (1), shall be taxable without regard to the provisions of subsection (a) (1), except that—

"(1) The gross income shall include only income from the sources specified in subsection (a) (1) . . ." 53 Stat. 75, 76, 54 Stat. 518.

in trade or business within the United States." 26 U. S. C. § 211 (c) (1) (1941). For the sources of taxable gross income it refers to § 211 (a) (1) (A), which specifically deals with the taxation of nonresident aliens like Wodehouse.[5] The authority under which the tax was here levied provides: "There shall be levied, collected, and paid [a tax on] . . . the amount received . . . from sources within the United States as . . . other fixed or determinable annual or periodical gains, profits, and income . . . ." 26 U. S. C. § 211 (a) (1) (A).

2. The Court draws on § 119 (a) (4) to support the tax.[6] But proceeds within § 119 (a) cannot be considered

---

[5] The subsection reads as follows:

"SEC. 211. TAX ON NONRESIDENT ALIEN INDIVIDUALS.

"(a) No UNITED STATES BUSINESS OR OFFICE.—

"(1) GENERAL RULE.—

"(A) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year, in lieu of the tax imposed by sections 11 and 12, upon the amount received, by every nonresident alien individual not engaged in trade or business within the United States and not having an office or place of business therein, from sources within the United States as interest (except interest on deposits with persons carrying on the banking business), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income, a tax of 15 per centum of such amount. . . ." 53 Stat. 75, 54 Stat. 518.

[6] "SEC. 119. INCOME FROM SOURCES WITHIN UNITED STATES.

"(a) GROSS INCOME FROM SOURCES IN UNITED STATES.—The following items of gross income shall be treated as income from sources within the United States:

"(4) RENTALS AND ROYALTIES.—Rentals or royalties from property located in the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using in the United States, patents, copyrights, secret processes and formulas, good will, trade-marks, trade brands, franchises, and other like property . . . ." 53 Stat. 53, 54, 26 U. S. C. § 119 (a) (4).

within § 211 (a) (1) (A) unless the definition of § 211 (a) (1) (A) is also satisfied, that is, unless the proceeds are "fixed or determinable annual or periodical income." Cf. U. S. Treas. Reg. 111, § 29.143–2. The subsections of § 119 (a) serve merely to define what proceeds are to be deemed localized in the United States for tax purposes; they settle only the geographic question; § 119 (a) is not a tax-imposing provision; other sections of the Code serve that function.

3. An analysis of the relevant provisions, in light of the changes made in 1936, makes this perfectly clear. Until 1936, the tax-imposing provisions were coterminous with the provisions of § 119 (a) in defining the taxable gross income of a nonresident alien. This was so because taxability was limited only by § 211 (a) of the Revenue Act of 1934 which provided that "In the case of a nonresident alien individual gross income includes only the gross income from sources within the United States." 48 Stat. 735. Supplement H of the Revenue Act of 1934 provided for deductions and credits (§§ 212–215, 48 Stat. 736–737), but there was no other provision further defining or limiting the type of receipts to be included in gross income. See 48 Stat. 735–737, 684. Thus, whatever was gross income from a source within the United States was taxed. By the Revenue Act of 1936, Congress changed the scheme of taxing nonresident aliens. 49 Stat. 1714; see 8 Mertens, The Law of Federal Income Taxation, § 45.16, *et seq.* (1942). For those who have a place of business in the United States it retained the system of taxing all proceeds from sources within the United States. Revenue Act of 1936, § 211 (b), 49 Stat. 1714. As to such aliens the provisions of § 119 continued to determine what receipts were to be included. And that has remained the law. 26 U. S. C. § 211 (b). But as to those who are "not engaged in trade or business within the United States," the only type of proceeds to be taxed were

those which were attributable to sources within the United States but only if there were "fixed or determinable annual or periodical gains, profits, and income." Such has remained the law and controls this case. (Compare 26 U. S. C. § 211 (a) (1) (A), the applicable provision when the nonresident alien is not engaged in trade or business within the United States, with 26 U. S. C. § 211 (b), the section applicable when the nonresident alien has a place of business in the United States.)

The specifically defined receipts—fixed or determinable annual or periodical gains, profits, or income—are not words giving rise to an exemption, and as such to be strictly construed. They are the controlling basis for taxation. To be taxable under § 211 (a) (1) (A) the proceeds must be from sources within the United States, as set forth in § 119 (a), but also of the nature defined in § 211 (a) (1) (A). See 54 Yale L. J. 879, 881–882 (1945); 48 Col. L. Rev. 967 (1948); cf. U. S. Treas. Reg. 111, § 29.143–2. Since the reach of § 211 (a) (1) (A) does not include the proceeds from a sale, receipts from a sale are not taxable even though such proceeds are from a source within the United States and, as such, are listed in § 119 (a) (5)–(6). The Regulations have made this explicit. U. S. Treas. Reg. 111, §§ 29.211–7, 29.143–2; see also S. Rep. No. 2156, 74th Cong., 2d Sess., p. 21 (1936); H. R. Rep. No. 2475, 74th Cong., 2d Sess., pp. 9–10 (1936).

The changes made in 1936 in the method of taxing income of a nonresident alien "not engaged in trade or business within the United States" make the taxing provisions coterminous, not with § 119 (a), but with § 143 (b), the section providing for withholding taxes at the source. Section 143 (b) emphasizes that proceeds within § 119 (a) do not come within the scope of § 143 (b) unless the additional qualification contained in § 143 (b) is also met. Section 143 (b) provides that the tax should be withheld on income which is "fixed or determinable an-

nual or periodical gains, profits, and income (but only to the extent that any of the above items constitutes gross income from sources within the United States) . . . ." 26 U. S. C. § 143 (b). Here again, since "the income derived from the sale in the United States of property, whether real or personal, is not fixed or determinable annual or periodical income," it is not included. U. S. Treas. Reg. 111, § 29.143–2. Only by not observing the requirement that the proceeds must not only be from a source in the United States but also "annual or periodical" to be subject either to withholding under § 143 (b), or to taxation under § 211 (a) (1) (A), can it be said that proceeds which prior to 1936 were held to be under § 119 (a) (4) are *ipso facto* within § 211 (a) (1) (A) after 1936 regardless of the nature of the revenue.

Therefore, inquiry which seeks to discover prior practice as an aid to construction should properly address itself to whether such proceeds were withheld under § 143 (b) before 1936. Inquiry as to § 119 (a) is completely irrelevant because it is clear that before 1936 many items were included in § 119 (a) which were not withheld under § 143 (b). Since 1936 the only proceeds which are taxed to a nomesident alien not engaged in a trade or business in the United States are those which are "fixed or determinable annual or periodical gains, profits, and income," which is the only type of proceeds on which taxes were withheld at the source before as well as after 1936. Therefore Treasury practice regarding the withholding requirement prior to the 1936 legislation would be relevant. There is a total absence of any showing that the Treasury before 1936 regarded such proceeds subject to withholding under § 143 (b). And in the analogous situation of lump-sum payments for the absolute transfer of some but not all of the exclusive rights conferred by the patent law, courts have held such proceeds not subject to withholding under § 143 (b). *Gen-*

*eral Aniline & Film Corp.* v. *Commissioner,* 139 F. 2d 759 (C. A. 2d Cir.); cf. *Commissioner* v. *Celanese Corp.,* 78 U. S. App. D. C. 292, 140 F. 2d 339.

The Regulations, to be sure, give "royalties" as an example of proceeds which are within the phrase "fixed or determinable annual or periodical gains, profits, and income." See U. S. Treas. Reg. 111, § 29.211–7. But proceeds sought to be brought within the term "royalties" must be of a nature which justifies that classification. Royalties are within the section only because they meet the above description. It completely ignores the intrinsic character of "royalties," and therefore the basis of including them in the larger category of "fixed or determinable annual or periodical gains, profits, and income," to infer that proceeds which do not meet that description but result from the use of another method of realizing economic gain from a property right—that of sale rather than a license producing a recurring income—are also "royalties." See 48 Col. L. Rev. 967, 969 (1948). By such reasoning proceeds from the sale of a house would also be within § 211 (a) (1) (A) because another way that the owner could have realized gain on the property would have been to have leased it over its lifetime.[7]

Free judicial rendering of needlessly imprecise legislation is sufficiently undesirable in that it encourages Congress to be indifferent to the duty of giving laws attainable definiteness. Here we are dealing with legislation that is precise. Yet the Court chooses not to give it effect and it does so on the basis of fiscal considerations which Congress, by what it enacted, chose not to write into law.

---

[7] Rent is specifically included within § 211 (a) (1) (A); proceeds from the sale of real property, however, are excluded. U. S. Treas. Reg. 111, § 29.211–7.

It must be remembered that the problem here is not to determine what is income in either a constitutional or an economic sense. The proceeds from the sale of a house over and above its cost to the seller are as much income as is a judge's salary. Nor is the problem one of determining whether something which is usually regarded as income is to escape a tax because the parties by agreement act in such a way as to cause the proceeds to be received in a different manner. Cf. *Lyeth* v. *Hoey*, 305 U. S. 188. There is no suggestion that the transaction as it appears on the surface was not the transaction in truth. The fact that the incidences of income taxation may have been taken into account by arranging matters one way rather than another so long as the way chosen was the way the law allows, does not make a transaction something else than it truly is—it does not turn a sale into a license. *Helvering* v. *Gregory*, 69 F. 2d 809, 810 (C. A. 2d Cir.). Therefore, the principle of tax evasion is irrelevant to the disposition of this case, except on the assumption that Congress itself evaded its own tax purposes and that the Court must close what Congress left open. It is taking too much liberty even with tax provisions to read out a defining clause that Congress has written in merely because Congress permitted desirable revenue to escape the tax collector's net. The only judicial problem is whether the proceeds constitute a type of income which Congress has designated as taxable. That type must have the characteristic of being "fixed or determinable annual or periodical gains, profits, and income." A lump-sum payment for an exclusive property right, transferable and transferred by the taxpayer, simply does not meet that qualification. Unless there is something inherent in the copyright law to prevent it, such a transaction is the familiar "sale of personal property." U. S. Treas. Reg. 111, § 29.211–7. Surely it is a sale of a capital asset. See Learned Hand, J., in *Goldsmith* v. *Com-*

*missioner,* 143 F. 2d 466, 467 (C. A. 2d Cir.). As such it is not subject to the tax. The legislative history leaves no doubt on this point.[8]

4. So far it has been assumed that these proceeds would be within § 119 (a) (4). But neither this Court nor Congress has ever said so; indeed no court other than the Court of Appeals for the Second Circuit, and the Tax Court (but only after its contrary determination was reversed by the Court of Appeals for the Second Circuit) has said so. But it is urged that a "long prior practice" of including under § 119 (a) (4) proceeds received as lump-sum payments for the absolute transfer of some but not all of the rights conferred by the copyright law, and therefore taxing them to nonresident aliens under the prior statute, prevents this Court from applying § 211 (a) (1) (A) according to the fair meaning of its own terms. It is suggested that, no matter what Congress has written on the statute books, it is to be assumed that Congress would not give up a source of revenue it had once tapped. This suggestion is made despite the fact that Congress said that it was changing the method of taxing the income of nonresident aliens and that it also said that certain items, previously taxed, would now be exempt. S. Rep. No. 2156, 74th Cong., 2d Sess., p. 21 (1936); H. R. Rep. No. 2475, 74th Cong., 2d Sess., pp. 9–10 (1936). What is this long prior practice that has encrusted the phrase, "royalties for the use of or for the privilege of using in the United States, patents, copyrights . . . and other like property," with a meaning that contradicts its own terms not otherwise defined by

---

[8] The Reports in both the House and Senate say specifically that a result of § 211 (a) (1) (A) is that "such a nonresident alien will not be subject to the tax on capital gains . . . ." S. Rep. No. 2156, 74th Cong., 2d Sess., p. 21 (1936); H. R. Rep. No. 2475, 74th Cong., 2d Sess., pp. 9–10 (1936); see Fulda, *Copyright Assignments and the Capital Gains Tax,* 58 Yale L. J. 245, 259, 260–266 (1949).

Congress, yet precludes this Court from construing it according to the obvious purport of familiar words?

Section 119 (a) (4), or a provision with similar phrasing, has been part of the Revenue Laws since 1921. See Revenue Act of 1921, § 217 (a) (4), 42 Stat. 244. Soon after its enactment the Bureau ruled that receipts from the absolute transfer by a nonresident alien of the rights to serial publication in the United States of certain literary works were not derived from a source in the United States. The reason given was that the transaction did not constitute a license for use, but a sale. O. D. 988, 5 Cum. Bull. 117 (1921); see also I. T. 2169, IV–1 Cum. Bull. 13 (1925) (sale of motion-picture right to play deemed a sale of a capital asset). The ruling prevailed through the subsequent reenactment of the phrasing in § 119 (a) (4) in 1924, 1926, 1928, and 1932, see 43 Stat. 273; 44 Stat. 30; 45 Stat. 826, 827; 47 Stat. 208, 209. In 1933 the Bureau made a contrary ruling which expressly revoked the one made in 1921. But the facts on which the Bureau took this action are important.

The taxpayer had received the income in question pursuant to contracts with a number of publishers and producers under which he had granted serial rights in books already written, reserving a "stipulated royalty per copy sold." The Bureau characterized all but one of these contracts as requiring "stipulated sums . . . to be paid to him as royalties." Moreover, in some of these contracts yearly licenses were granted, renewable at the taxpayer's option, with stipulated royalties per copy. In one contract a company was granted first American and Canadian serial rights in the taxpayer's exclusive output of both long and short stories for which the company was to pay a stipulated sum of money, and in another contract the taxpayer granted motion-picture rights throughout the world, the consideration to be paid in installments. The Bureau ruled that these proceeds were within

the phrase ". . . royalties from . . . [or] for the use of or for the privilege of using in the United States . . . copyrights . . . ." 26 U. S. C. § 119 (a) (4).

The reasoning on which this conclusion was based deserves attention.[9] This is the crux of it:

"The taxpayer in these contracts granted the publishers and producers licenses to use in particular

[9] "In 13 Corpus Juris (1094–1095) it is stated that a copyright is an indivisible thing and can not be split up and partially assigned, either as to time, place, or particular rights or privileges, less than the sum of all the rights comprehended in the copyright; that exclusive rights may, however, be granted, limited as to time, place, or extent of privileges which the grantee may enjoy; and that the better view is that such limited grants operate merely as licenses and not as technical assignments, although often spoken of as assignments. [Citing two lower court cases having to do with procedural questions.]

"It is apparent from the facts in this case that in no instance did the taxpayer assign his literary property in its entirety or his copyright therein, or his indivisible rights therein in granting the serial, the volume, the book, the second serial, the dramatic or motion picture rights to the various contracting parties. The taxpayer in these contracts granted the publishers and producers licenses to use in particular ways his literary property and his copyright therein, and exacted from them certain payments for that use. These were not, and could not be, contracts of sales; they were in fact contracts of license, and the payments for such licenses constituted rentals or royalties subject to tax as such. . . .

". . . Since the grant by the taxpayer in each instance is so clearly the grant of a particular right in all the rights constituting the taxpayer's literary property and copyright, the conclusion is obvious that the grant is a license and not a sale.

"In Office Decision 988, supra, a grant of all rights of serial publication in the United States in certain literary works was through error said to be a sale. Such a grant could only be a license. Office Decision 988 is accordingly revoked.

"In I. T. 1231, supra, it was stated that there was a sale of serial rights of publication. Since it is held that such a grant could only be a license, I. T. 1231 is modified to accord with the views herein expressed." I. T. 2735, XII–2, Cum. Bull. 131, 134–35 (1933).

ways his literary property and his copyright therein, and exacted from them certain payments for that use. These were not, and could not be, contracts of sales; they were in fact contracts of license, and the payments for such licenses constituted rentals or royalties subject to tax as such. . . .

". . . Since the grant by the taxpayer in each instance is so clearly the grant of a particular right in all the rights constituting the taxpayer's literary property and copyright, the conclusion is obvious that the grant is a license and not a sale.

.            .            .            .            .

"In Office Decision 988, supra, a grant of all rights of serial publication in the United States in certain literary works was through error said to be a sale. Such a grant could only be a license. Office Decision 988 is accordingly revoked." I. T. 2735, XII–2, Cum. Bull. 131, 135 (1933).

Thus it is seen that on the Bureau's earlier construction that the Copyright Law permitted a sale, such proceeds were excluded. O. D. 988, 5 Cum. Bull. 117 (1921). After twelve years the Bureau decided that, as a matter of Copyright Law and not by way of formulating a fiscal policy, there could be no sale of serial rights and that such a transaction had to be treated as a license, periodically producing income. Plainly the Bureau was not interpreting tax law but copyright law. Deference no doubt is due to an administrative body's interpretation of law dealing with its specialty—particularly to interpretations by those whose task it is to administer the Revenue Laws. But the Bureau's expertness does not extend to the Copyright Law. Such matters do not involve the subtleties of tax concepts. The determination rather is like that of a question of common law, and such questions have never been thought to be of a type as to which any degree of finality was given to the ad-

ministrative view. Cf. *Trust of Bingham* v. *Commissioner*, 325 U. S. 365, 377, 381. Under these circumstances the Bureau's determination has little weight, and certainly does not bar this Court from properly construing the Copyright Law, especially where Congress had thoroughly overhauled the tax provisions pertaining to nonresident aliens less than three years after the Bureau ruling was made. As one swallow does not make a summer, this one ruling hardly establishes a practice, and certainly does not disclose a consistency which deserves to be called "long."

Balanced against this one Bureau decision, such as it is, is the significant fact that at the crucial time—in 1936, when Congress devised the present scheme of taxing nonresident aliens—a more authoritative decision was explicitly to the contrary. This was the holding of the Board of Tax Appeals in *Rafael Sabatini*, 32 B. T. A. 705.[10] In the *Sabatini* case the Board held that the lump-sum payments received for exclusive world motion-picture rights were not within § 119 (a) (4). About such proceeds it said:

> "The situation respecting the granting of motion picture rights is quite different from the other rights

---

[10] In the *Sabatini* case the transfer of the motion-picture rights, as was true of the book rights, took place in England, but the attempt was made to bring the proceeds within § 119 (a) (4) on the ground that the rights were to be exercised in the United States. Since the proceeds from the book rights were tied to use in the United States, they were held to be included within § 119 (a) (4). But the proceeds from the transfer of the motion-picture rights were not included because the proceeds were not tied to a subsequent use in the United States. There, as here, it was urged that the subsequent exploitation of the copyright by the transferee in the United States brought the proceeds within § 119 (a) (4) because it was not possible for the transfer to have been anything other than for the use, rather than the sale, of rights in the copyright. But this contention can rest only on the assumption that a copyright is indivisible.

above discussed. In none of the motion picture contracts did petitioner obtain any income from the reproduction and sale or other use of his writings in the United States as in the case of the Houghton Mifflin Co. and Wagner contracts. Here the granting of rights was made in consideration of a lump sum. The sale of these rights took place in England [citing a case], and there was no subsequent income in the nature of rents or royalties from sources within the United States. We are accordingly of the opinion that the lump sums received by petitioner for the motion picture rights do not come within the statutory definition of income from sources within the United States and are not taxable income." *Rafael Sabatini,* 32 B. T. A. 705, 712–13 (1935), reversed on this point, 98 F. 2d 753, 755 (C. A. 2d Cir. (1938)).[11]

Thus at the time of the adoption of the present § 211 (a) (1) (A) this was the authoritative administrative ruling as to § 119 (a) (4). It is not suggested that knowledge of this ruling must be attributed to Congress, but this ruling refutes the assumption that there was a settled practice the other way. To the extent that it could be considered settled, it was contrary to the Court's account of it. Finally it shows at least that what administrative practice there was could not be considered settled.

After the Board was reversed in the *Sabatini* case, it of course followed the decision of the Court of Appeals.

---

[11] This reversal of the Board of Tax Appeals did not occur until 1938, two years after Congress had revised the provisions taxing nonresident aliens. In reversing, the Court of Appeals first determined that the transfer of less than all the rights precluded a sale. It then held that the proceeds should be included, admitting however that there "seems to be no direct authority for this view of the meaning of the statute . . . ." *Sabatini* v. *Commissioner,* 98 F. 2d 753, 755 (C. A. 2d Cir.).

The passage of the Internal Revenue Code, including § 211 (a) (1) (A), is hardly a ground for implying legislative adoption of the construction placed on § 119 (a) (4) by the Court of Appeals for the Second Circuit. *Helvering* v. *Hallock,* 309 U. S. 106, 120–21, n. 7. When the entirely distinct problem involved in § 211 (a) (1) (A) came before the Court of Appeals for the Second Circuit, it based its decision on the determination that the proceeds were for the use rf the copyright rather than a sale.[12] That decision, like the *Sabatini* case, was based primarily on the doctrine of the indivisibility of a copyright.[13] When that doctrine is rejected, it has been held to follow, as we have seen, that the proceeds are not included. That was the basis of decision in the Fourth Circuit, now under review. Moreover, the Court of Appeals for the Second Circuit has reached a result contrary to its copyright cases when dealing with the proceeds from the transfer of some but not all of the rights conferred by the patent

---

[12] This case was not decided until 1946. *Rohmer* v. *Commissioner,* 153 F. 2d 61 (C. A. 2d Cir.). *Molnar* v. *Commissioner,* 156 F. 2d 924 (C. A. 2d Cir.), is not such a case. The court there dealt solely with the apportionment problem involved in computing taxpayer's income when the copyright was to be used in both the United States and other parts of the world.

[13] In *Rohmer* v. *Commissioner,* 153 F. 2d 61 (C. A. 2d Cir.), the court said: "Where a copyright owner transfers to any particular transferee substantially less than the entire 'bundle of rights' conferred by the copyright, then payment therefor, whether in one sum or in several payments, constitutes royalties within the meaning of § 211 (a) (1) (A). For such a transfer is the grant of a license. Payment for the grant of such a license is measured by reference to the future use or expected use of the license by the licensee . . . . It is like interest paid for several years." P. 63. That the doctrine of indivisibility determined decision appears from *Standard Oil Co.* v. *Clark,* 163 F. 2d 917, 936, 939 (C. A. 2d Cir.). The decision in *Sabatini* v. *Commissioner,* 98 F. 2d 753, 755 (C. A. 2d Cir.), also turned on the doctrine of the indivisibility of a copyright.

statute.[14]   It did so despite the fact that the term "royalties" includes proceeds for the use of patents, 26 U. S. C. § 119 (a) (4), and that, as will be seen, the theory of the indivisibility of a copyright had its genesis in a doctrine first applied in the patent field.

5. Thus we are brought to the question which the Treasury, the courts and the parties here have regarded as determinative of this controversy: may serial rights under a copyright be sold in law as they constantly are sold in the literary market?   Specifically, is there some inherent obstacle of law which precludes the sale of such serial rights from having the usual incidents of a commercial sale?   If it were impossible to make a sale, then the proceeds arguably are "royalties" because in that event the transfer can have been only for the use.   There would still remain the difficulty of getting the lump-sum payments within the reasonable meaning of § 211 (a) (1) (A).   For, it is fair to recall, § 119 (a) (4) would only determine whether the payment is from a source within the United States, not whether it is taxable.   There would be the further difficulty of calling a payment a "royalty" when its amount bears only that relation to the future proceeds obtained by the transferee in exploiting the literary product as would be reflected in the purchase price of any income-producing property.   If, on the other hand, the valuable right that, commercially speaking, was in fact sold, may as a matter of law also be treated as a sale, the proceeds would not be included. This conclusion, derived from a reading of § 211 (a) (1) (A), is made explicit by the Regulations and the House and Senate Reports.   See *ante,* pp. 410–411.

---

[14] *General Aniline & Film-Corp.* v. *Commissioner,* 139 F. 2d 759 (C. A. 2d Cir.); see also *Commissioner* v. *Celanese Corp.,* 78 U. S. App. D. C. 292, 140 F. 2d 339.   Both cases are under § 143 (b), the section with which § 211 (a) (1) (A) was made coterminous.

The notion that the attributes of literary property are by nature indivisible and therefore incapable of being sold separately, is derived from a misapplication by lower courts of two early cases in this Court. These were concerned with the right of the transferee of less than all the rights conferred by a patent to sue an infringer. The inherent nature of the interests in intellectual property and their commercial negotiability were not involved. The Court determined the procedural problem before it so that the infringer would not "be harassed by a multiplicity of suits instead of one," and would be not subjected to "successive recoveries of damages by different persons holding different portions of the patent right in the same place." *Gayler* v. *Wilder,* 10 How. 477, 494–95 (U. S. 1850); *Waterman* v. *Mackenzie,* 138 U. S. 252, 255. But in its bearing on the procedural point, one of these cases recognized the saleability of less than all of the patented rights so long as the transfer consisted of at least one of the three rights separately listed in the patent statute. *Waterman* v. *Mackenzie, supra.*

We thus find scant illumination of the intrinsic and legal nature of property rights in a copyright in the procedural analysis of these cases. Keener insight into such rights has been given by Mr. Justice Holmes in a case involving substantive questions in the law of copyrights:

> "The notion of property starts, I suppose, from confirmed possession of a tangible object and consists in the right to exclude others from interference with the more or less free doing with it as one wills. But in copyright property has reached a more abstract expression. The right to exclude is not directed to an object in possession or owned, but is *in vacuo,* so to speak. It restrains the spontaneity of men where but for it there would be nothing of any kind to hinder their doing as they saw fit. It is a pro-

hibition of conduct remote from the persons or tangibles of the party having the right. It may be infringed a thousand miles from the owner and without his ever becoming aware of the wrong. It is a right which could not be recognized or endured for more than a limited time, and therefore, I may remark in passing, it is one which hardly can be conceived except as a product of statute, as the authorities now agree." *White-Smith Music Co.* v. *Apollo Co.,* 209 U. S. 1, 18, 19; see also Learned Hand, J., in *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corp.,* 213 F. 374, 378 (S. D. N. Y.).

The "right to exclude others from interference with the more or less free doing with it as one wills" is precisely the right that Wodehouse transferred to Curtis. To the extent that the Copyright Law gave Wodehouse protection in the United States, he transferred all he had in property of considerable value—the serial rights in his novels—and Curtis acquired all of it. For the duration of the monopoly granted by the Copyright Law, Curtis could assert the monopoly against the whole world, including Wodehouse himself.

Nothing in the law of copyrights bars or limits sale of any one of the numerous exclusive rights conferred by the various subdivisions of § 1. Congress has not disallowed such sales and nothing in the due enforcement of the Copyright Law suggests their disallowance. Quite the contrary. See II Ladas, The International Protection of Literary and Artistic Property, pp. 775–792 (1938). The scheme and details of the Copyright legislation manifest a separate treatment of the various exclusive rights conferred by the statute. 61 Stat. 652, 17 U. S. C. §§ 1 *et seq.* It segregates these rights into sepa-

rately numbered paragraphs.[15]   In each paragraph there is listed, in the alternative, a more detailed subdivision of the various rights.   Each of these rights is substantial and exists separately from the others,[16] and has of course

---

[15] Section one of the Copyright Law provides:

"§ 1. EXCLUSIVE RIGHTS AS TO COPYRIGHTED WORKS.—Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

"(a) To print, reprint, publish, copy, and vend the copyrighted work;

"(b) To translate the copyrighted work into other languages or dialects, or make any other version thereof, if it be a literary work; to dramatize it if it be a nondramatic work; to convert it into a novel or other nondramatic work if it be a drama; to arrange or adapt it if it be a musical work; to complete, execute, and finish it if it be a model or design for a work of art; .

"(c) To deliver or authorize the delivery of the copyrighted work in public for profit if it be a lecture, sermon, address, or similar production;

"(d) To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever; and

"(e) To perform the copyrighted work publicly for profit if it be a musical composition; and for the purpose of public performance for profit, and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced: . . . ."   61 Stat. 652, 17 U. S. C. § 1.

[16] "A man having general statutory dramatic rights like Kauffman might make a play and perform it under his common-law rights without publication, or he might copyright the play, and he would still not have copyrighted or published his moving picture rights. If he wrote such a scenario and made his film, he could get a separate copyright upon that.   Of course, he could sell his statutory or com-

been considered a property right. See *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corp.*, 213 F. 374, 377 (S. D. N. Y.); see Fulda, *Copyright Assignments and the Capital Gains Tax,* 58 Yale L. J. 245, 256 (1949). Moreover, the Copyright Office will record these partial assignments, thus protecting the transferee and thereby increasing the marketability of the separate rights. 61 Stat. 652, 17 U. S. C. § 30; see *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corp.*, 213 F. 374, 376–377; see II Ladas, The International Protection of Literary and Artistic Property, p. 802 (1938).

Only the other day the House of Lords, dealing with a similar copyright law, held that the sums received from the transfer of the motion-picture rights in a novel were proceeds from a sale of property rather than a license and therefore not taxable as "annual profits or gains." *Withers* v. *Nethersole,* [1948] 1 All E. R. 400. There was there, as here, the need to determine if the proceeds were from a sale. The taxpayer had transferred for ten years "the sole and exclusive motion picture rights throughout the world." The House of Lords held that the proceeds were not "annual profits or gains" since the transaction was an outright sale, not a license to

---

mon-law copyright of the play and keep the moving picture copyright, or he could sell each.

"It seems to me clear that, if he could do this, he could sell separately the right to dramatize and the right to make a moving picture play, dividing his statutory dramatizing rights, and thus giving each assignee the right when he had exercised those rights to get his own copyright for a drama, or for a moving picture show." Learned Hand, J., in *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corp.*, 213 F. 374, 377 (S. D. N. Y.). See also *Withers* v. *Nethersole,* [1948] 1 All E. R. 400. "The effect of a partial assignment of copyright for a period less than the whole term is not to create any new right, but only to divide the existing right. In the result, there are two separate owners each with a distinct property. Neither holds under the other." At p. 404.

use the copyright. This portion of the late Lord Uthwatt's judgment is especially pertinent:

> "The fact that the same commercial result as that produced by the assignment might equally well have been achieved by an appropriately worded licence is irrelevant. It is irrelevant that the consideration may be assumed to represent the value of the whole copyright so far as it relates to motion pictures for a period of years, but the consideration was paid, not in respect of the temporary use of another's property, but for the purchase of property with a limited life. The taxpayer may have exploited her property, but she did so only by dividing it and selling part of it. . . . The relevant fact is that an owner of an asset, entitled by law to divide it into two distinct assets, has done so by selling one of those assets for an agreed consideration payable in a lump sum. A sale, not in the way of trade, of an asset does not attract tax on the consideration. Whatever else comes within the ambit of annual profits and gains, the consideration received by the taxpayer does not." *Withers* v. *Nethersole,* [1948] 1 All E. R. 400, 405.

I am not suggesting that the decision of the House of Lords requires our concurrence. To pass it over in silence, however, is not to answer it.

Another case likewise deserves attention. In the Second Circuit, interestingly enough, it was held that a transfer of exclusive motion-picture rights was "a sale" of a "capital asset" for the purpose of § 117. *Goldsmith* v. *Commissioner,* 143 F. 2d 466 (C. A. 2d Cir.). But if the transfer was a sale of a capital asset, it could not also have been within § 211 (a) (1) (A). See S. Rep. No. 2156, 74th Cong., 2d Sess., p. 21 (1936); H. R. Rep. No. 2475, 74th Cong., 2d Sess., pp. 9–10 (1936).

To treat the transfer of any one of the various rights conferred by the Copyright Law as a sale would accord not only with analysis of their essential character and the scheme of the Copyright Law, but with the way these rights are treated by authors and purveyors of products of the mind for whose protection the Copyright Law was designed because of the belief that the interests of society would be furthered. The various exclusive rights have different attributes and therefore different significance. For that reason they may be sold separately and form the basis for a new copyright. The author "could sell separately the right to dramatize and the right to make a moving picture play." *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corp.,* 213 F. 374, 377 (S. D. N. Y.), aff'd, 220 F. 448. See as to the commercial practice, Fulda, *Copyright Assignments and the Capital Gains Tax,* 58 Yale L. J. 245, 253–54 (1949); see also Ladas, The International Protection of Literary and Artistic Property, *passim* (1938).

Thus it would seem as a matter of legal doctrine that where a person transfers absolutely to another, under terms of payment which do not depend on future use by the transferee, a distinct right conferred by the Copyright Law granting the transferee a monopoly in all the territory to which the Copyright Law itself extends, legal doctrine should reflect business practice in recognizing that the proceeds are from "the sale of personal property," rather than amounts received as "fixed or determinable annual or periodical gains, profits, and income."

It is argued that Congress doubtless intended to tax an alien author for the proceeds of a sale of serial rights, because such proceeds are taxable to an American author. By this mode of reasoning the Court ought to hold that since an American author is taxed when he sells all his rights, the proceeds derived by an alien author from the

sale of all his rights in this country are also taxable for that is a much larger source of potential revenue. Yet Congress has chosen not to tax the alien author for such larger income than is received from the sale merely of serial rights, although the native author is so taxed. It is for Congress to make differentiations between alien and American authors and we should respect the differentiations Congress has made for the sale both of serial and total rights as between alien and American authors. The need for revenue is no justification for warping the provisions of the 1936 legislation to deny immunity from taxation to a nonresident alien author for the entire transfer of some of the property interests explicitly conferred by § 1, particularly in view of the fact that Congress knowingly chose to leave untouched the more sizeable source of revenue available where the nonresident alien sells all the rights conferred by § 1. Wodehouse made an absolute transfer of some of those rights. He did not receive royalties but instead gave up that chance in return for a lump sum, just as the seller of a house gives up the right to receive rent in return for the purchase price. That transaction can only be regarded as a sale. As the revenue laws now stand, it was nontaxable.

I would affirm the judgment below.